1
2
3
4
5
6
7
8              **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   RONALD JERRELL INMAN,              No. CIV S-08-2217-CMK-P

12              Petitioner,

13        vs.                          <u>MEMORANDUM OPINION AND ORDER</u>

14   KENNETH CLARK,

15              Respondent.

16   _____/

17              Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to the written consent of all parties, this

19   case is before the undersigned as the presiding judge for all purposes, including entry of final

20   judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending before the court are petitioner's petition for a writ of

21   habeas corpus (Doc. 1), petitioner's memorandum in support thereof (Doc. 12), respondent's

22   answer (Doc. 27), and petitioner's reply (Docs. 31, 32, and 33).

23   / / /

24   / / /

25   / / /

26   / / /

# I. BACKGROUND

A.   **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

## A. Counts 1 through 5 (Victim # 1)

Counts 1 through 5 alleged that between November 6, 1994, and November 5, 1996, Inman violated section 288, subdivision (a) by committing lewd and lascivious acts on Victim # 1, a child under 14 years of age. Each count also alleged Inman had more than one victim, making him eligible for a sentence enhancement pursuant to section 667.61, subdivision (b).

Victim # 1 first met Inman when his older brother was on the soccer team that Inman coached. The following year, Victim # 1 joined the team. He spent several nights at Inman's house, although he was uncertain of the circumstances. Inman's sister, Peggy Inman, lived with Inman when Victim # 1 slept at Inman's house.

The first time Victim # 1 was touched by Inman was when he was taking a bath at Inman's house. Victim # 1 was 11 or 12 at the time. He got an erection and he called Inman in to ask if it was normal to get an erection. Inman said it was and that he could relax it for him. Inman began rubbing Victim # 1's penis. Victim # 1 became uncomfortable and rolled over. Inman left the bathroom.

On another occasion, Victim # 1 was sleeping in Peggy Inman's bedroom when Inman came into the bedroom and climbed into bed with him. Inman began rubbing Victim # 1's penis. Victim # 1 said he had to go to the bathroom and got out of bed. Inman left the room.

Victim # 1 also remembered watching pornographic movies on cable channels while he was at Inman's house. He also watched a pornographic video with Inman in Inman's bedroom. During the movie, Inman tried to grab Victim # 1's penis through his clothes, even though Victim # 1 told him to stop. Inman then pulled down his pants and asked Victim # 1 to fondle him. Victim # 1 grabbed Inman's penis hard so that Inman would stop asking him.

Victim # 1 remembered another event that may have occurred that same evening, or it could have been another occasion. Victim # 1 was naked and Inman was trying to have anal intercourse with him. Victim # 1 ran out of the room.

---

[1]      Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. <u>See id.</u> These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

On another occasion, Victim # 1 fell asleep on the living room floor while watching television.  When he awoke, Inman was lying next to him.  Victim # 1's penis and groin were wet.  Inman said that Victim # 1 had ejaculated.

On another occasion, Inman told Victim # 1 they were going to play a game, and the object of the game was for Victim # 1 to stay still and not say anything while Inman touched him.  Inman would then run his fingers up one of Victim # 1's thighs, across the pubic area, and down the other thigh.  Inman did this several times before he stopped.

On another occasion, Victim # 1, his older brother, and an older male went camping with Inman and they played strip poker.  Everyone but Inman ended up naked.  Inman asked Victim # 1 to share his sleeping bag.  Victim # 1 refused.  When Victim # 1 awoke, Inman was sleeping in Victim # 1's sleeping bag.

When Victim # 1 asked Inman what would occur if Victim # 1 were to tell the police what had happened, Inman said he would tell the police that he committed the various acts because Victim # 1 wanted him to do so.  Victim # 1 was afraid because he did not want anyone to think he was homosexual.  All of theses incidents occurred when Victim # 1 was 11 or 12.

Victim # 1 did not tell anyone what occurred until he saw on the news that Inman had been arrested.

**B.  Counts 6 and 7 (Victim # 2)**

Counts 6 and 7 alleged that between January 1, 1996, and January 22, 1999, Inman violated section 288, subdivision (a) by committing lewd and lascivious acts with Victim # 2, a child under 14 years of age.  Each count also alleged Inman had more than one victim, making  him eligible for a sentence enhancement pursuant to section 667.61, subdivision (b).

Victim # 2 lived with Inman for a long time.  He was 11 at the time of trial.  Victim # 2's brother also lived with Inman and him.  Inman touched Victim # 2 in an improper manner on more than one occasion.  Victim # 2 described multiple episodes of sodomy.  Inman told Victim # 2 not to tell anyone. Victim # 2 also described being forced to copulate Inman orally.

In January 1999, Sergeant Mike Borges was assigned to investigate allegations that Inman had abused Victim # 2. Borges learned that Victim # 2 began living with Inman as a foster child in July 1996. Borges also learned Victim # 2 may have been confused about whether he had been molested by Inman or his biological father.  Borges was satisfied that Victim # 2 was referring to Inman.  Borges learned that the times when the alleged abuse occurred were times when Victim # 2 was in trouble. Victim # 2 was referred to a physician and a psychologist for evaluation. After completing the investigation, Borges closed the case.  When the new allegations involving Inman were made, Borges turned his investigation over to the assigned detective.

/ / /

/ / /

**C. Counts 9 and 10 (Victim # 3)**

Counts 9 and 10 alleged that on or about September 19, 1998, Inman violated section 288, subdivision (a) by committing lewd and lascivious acts with Victim # 3, a child under 14 years of age. Each count also alleged Inman had more than one victim, making him eligible for a sentence enhancement pursuant to section 667.61, subdivision (b).

Victim # 3 testified he was on Inman's soccer team for four years. Victim # 3 attended several parties hosted by Inman, including New Year's Eve parties and parties at a local lake. Victim # 3 also attended two Raiders football games with Inman. The first football game was against the Broncos on September 20, 1998. Victim # 3 was 12 at the time. His parents dropped him off at Inman's house the evening before the game. Victim # 3 and Inman both went into the hot tub and then went inside to watch television. Inman would not allow Victim # 3 to go into the house with wet shorts, so Victim # 3 took off his shorts and wrapped a towel around his body before he went inside and lay down on the floor to watch television. Inman came into the living room with a towel wrapped around his body. Inman asked Victim # 3 if he wanted a back massage. Victim # 3 said yes. After a few minutes, Inman took off his towel and Victim # 3's towel and attempted to sodomize Victim # 3. Victim # 3 resisted and there was no penetration. Inman then rolled Victim # 3 over onto his back and began orally copulating Victim # 3's penis. When Victim # 3 asked Inman why he was doing these things, Inman stated that it was just like sucking on your thumb. Inman began caressing Victim # 3's penis and asked Victim # 3 to do the same to him. Victim # 3 refused, left the living room, got dressed, and went to bed.

On another occasion, Inman showed Victim # 3 a binder that contained trading cards of race car drivers and also pictures of partially clothed women that were in the back of the binder.

Victim # 3 did not report these incidents to anyone until he learned that Inman was arrested for molesting a child. Victim # 3's father told Victim # 3 about the arrest and asked if there was anything Victim # 3 wanted to tell the detective. Victim # 3 said there was and his father took him to talk to the investigating detective.

**D. Counts 11 through 15 (Victim # 4)**

Counts 11 through 15 alleged that between September 1998 and February 1999 Inman violated section 288, subdivision (a) by committing lewd and lascivious acts with Victim # 4, a child under 14 years of age. Each count also alleged Inman had more than one victim, making him eligible for a sentence enhancement pursuant to section 667.61, subdivision (b).

Victim # 4 tried out for Inman's soccer team when he was about 12. He made the team his first year, but the next year he was unable to play. Inman put Victim # 4 on the roster as a trainer that year.

Inman sometimes would host parties at a local lake or at his home on New Year's Eve or Super Bowl Sunday. Members of the team and their families usually were invited to the lake or the Super Bowl parties. Normally, only team members would attend New Year's Eve parties and

they would spend the night at Inman's house.

Victim # 4 went with Inman to Monterey in November 1998 when he was 12 years old.  Inman asked Victim # 4 to accompany him so Victim # 4 could help him with Inman's two adopted sons.  Inman was going to Monterey to pick up a car and bring it back to his house.  When they returned home, Inman told his sons to go to bed.  Inman and Victim # 4 then went into the guest room and played video games.  While Victim # 4 was playing the video games, Inman came up behind him and put his hands down Victim # 4's pants and touched Victim # 4's penis.  Inman stopped when Victim # 4 asked him what he was doing.

A short while later, Victim # 4 was lying on the bed playing video games when Inman pulled up Victim # 4's shirt and started rubbing his stomach.  Inman next put his hands down Victim # 4's pants and pulled on Victim # 4's penis.  Inman lay down on the bed and asked Victim # 4 to rub his stomach.  Inman unzipped his pants but Victim # 4 returned to playing the video game.  Inman pulled down Victim # 4's pants and again put his hands on Victim # 4's penis.  Inman rolled Victim # 4 over and started to rub his buttocks.  Inman then rolled Victim # 4 over again, played with Victim # 4's penis, and put Victim # 4's penis in his mouth.  Victim # 4 said he had to go to the bathroom to get away from Inman.  When Victim # 4 emerged from the bathroom, Inman took Victim # 4 home.  On the way home, Inman told Victim # 4 not to tell anyone what occurred.  Victim # 4 did not tell his parents what happened because he was afraid.

About two to three months later, Victim # 4 went on a snow skiing trip with Inman.  Although Victim # 4 was afraid of Inman because of the last incident, he agreed to go on the ski trip because another boy, Austin, also was going on the trip.  The arrangement was that both boys would spend the night at Inman's house and they would leave early the next morning to go skiing.

After arriving at Inman's house, Victim # 4 and Austin watched a movie and then Victim # 4 went into the back yard to the hot tub while Austin continued watching the movie.  Inman joined Victim # 4 in the hot tub.  Inman put his hands down Victim # 4's pants and touched Victim # 4's penis.  Victim # 4 got out of the hot tub, took off his wet bathing suit, wrapped a towel around his waist, and returned to the living room to watch the movie.  When Victim # 4 went into the guest bedroom to change into his nightwear, Inman came in and started touching Victim # 4's penis.  After a minute or two, Inman returned to the living room to watch the movie.

After the movie, Victim # 4 and Austin went to bed.  Austin slept in the guest bedroom, and Victim # 4 slept on the couch in a sleeping bag.  During the night, Inman came into the living room and started fondling Victim # 4's penis again.  Inman asked Victim # 4 to come to Inman's room, but Victim # 4 refused. Inman returned to his bedroom.  Victim # 4 did not tell Austin what happened because he was afraid.

About two years later, Victim # 4 told his pastor what happened.  Victim # 4's pastor took him home and told his parents what had occurred and reported the matter to the police.  (footnote omitted).

Victim # 4's mother verified the trip to Monterey occurred in November 1998, and the ski trip occurred on February 7, 1999.

Austin verified the ski trip, watching the movie, and going into the hot tub. Austin got out of the hot tub before Victim # 4 and Inman. Inman gave Austin a back rub while they watched the movie. Inman commented that he could give Austin a back massage good enough to give Austin an erection. Inman also asked Austin to give him a back massage, but Austin refused.

### E.  Counts 17, 18, and 20 (Victim # 5)

Counts 17 and 18 alleged that on or about October 22, 2000, Inman violated section 288, subdivision (a) by committing lewd and lascivious acts with Victim # 5, a child under 14 years of age. Each count also alleged Inman had more than one victim, making him eligible for a sentence enhancement pursuant to section 667.61, subdivision (b).

Count 20 alleged that on or about January 28, 2001, Inman attempted to violate section 288.2 by attempting to exhibit harmful matter to Victim # 5, a minor, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of the minor.

Victim # 5's brother was on Inman's soccer team. Victim # 5 attended parties and trips to the lake with his brother. When Victim # 5 was about 10, Inman took Victim # 5 to a Raiders game against the Seahawks. Inman invited only Victim # 5 because Inman previously had taken Victim # 5's brother to a game without Victim # 5. During the ride to the game, Inman was tickling Victim # 5 on the leg. Sometimes Inman would touch Victim # 5's penis while he was tickling him. The touching gave Victim # 5 an erection. The same thing happened during the game.

The day after one of Inman's Super Bowl parties, Victim # 5 and his brother were at Inman's house. Inman called Victim # 5 into the computer room and had Victim # 5 sit on his lap. Inman was looking up Playboy and Hustler on his computer. Victim # 5 left to play with his brother before Inman was able to pull up any images.

### F.  Count 19 (Victim # 6)

Count 19 alleged that between September and November 2000, Inman violated section 288.2 by exhibiting harmful matter to Victim # 6, a minor, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of the minor.

Victim # 6 was not on Inman's soccer team, but he did attend some of his parties and activities as Victim # 4's friend. On one occasion in 1999, Victim # 6 went to Inman's house to do yard work. Instead of doing yard work, Victim # 6 and Inman went on to the computer. Victim # 6 checked his e-mail and then Inman started visiting Web sites, such as "littlelolitas.com" or "littleschoolboys.com." Inman was making comments about the size of the models' penises. Some of the sites showed young children having intercourse. After a while, they watched a football game on television. Inman paid Victim # 6, even though he never did any yard work that day. Inman told Victim # 6 not to tell his parents what they looked at on the computer.

/ / /

1

## G. Additional Prosecution Testimony

2      Damian Vuarnet was in the same jail unit as Inman before trial.  He
became friendly with Inman and discussed some of the incidents with him.
3      Inman told Vuarnet he would orally copulate Victim # 2 and his brother.
Inman also said he would masturbate the boys.
4      Inman said he had favorite boys on his soccer team, including
Justin, Steven, Austin, and Victim # 3.  Inman said he would leave X-rated
5      movies in the VCR and then go out and work in the garage, hoping the
kids would watch the movies.  Inman also said that after the games, he
6      would have the kids over and put Valium in their sodas so they would pass
out.  Inman said that giving the kids backrubs would arouse him.  Inman
7      claimed that Victim # 4 was obsessed with Inman, and Inman used that
obsession to take advantage of Victim # 4.  Inman claimed he gave Victim
8      # 3 Valium on the way home from a Raiders game and fondled him.
      Inman stated he preferred younger boys because he could not
9      control the older boys.  Inman said that his sister did not interfere with his
activities because she was disabled and never came out of her room.
10      James Kemp Van Ee was the lead investigator on the Inman
investigation.  Inman's home was searched on the day he was arrested.
11      Items seized included a floppy disk with the notation "Boys Secret Pages
Porno Club" and handwritten notes with Internet addresses for Web sites,
12      such as "boysource.net," "Lolitateen.com," "gayextreme.com,"
"innocentboys.net," and others.
13      Kemp Van Ee also found various images of a sexual nature on
Inman's computer involving young boys, either alone naked, naked with
14      other young boys or girls, or naked with men in various sex acts.  Some of
the images had been printed out and stored on Inman's desk.
15      Kemp Van Ee found a binder with race car driver trading cards in
it. The last three pages of the binder contained pictures of nude or scantily
16      clad women.  A pornographic movie was also found.
      Kemp Van Ee determined that the Raiders/Broncos game won by
17      the Broncos 34-17 occurred on September 20, 1998.  He also determined
that the Raiders/Dolphins game won by the Raiders 34-16 occurred on
18      November 30, 1997.  The Raiders/Seahawks game won by the Raiders 31-
3 occurred on October 22, 2000.  The Super Bowl after the 2000 football
19      season occurred on January 28, 2001.

20

## H. Defense Testimony

21      Charles H. is related to both Victim # 2 and Inman.  Charles H.
owns a farm. Victim # 2's biological parents were both involved in drugs.
22      Charles H. never saw anything inappropriate occurring between Victim # 2
and Inman.
23      According to Charles H., Victim # 2 originally lived with his
father, mother, and his father's family.  Victim # 2 was removed from this
24      home when his grandfather was accused of raping a two-year-old girl.
Victim # 2's biological father was never arrested for molestation.

25

26    / / /

7

1
2

Frank Rust knew Inman through their mutual interest in car racing. Frank Rust had been around Inman a few times when small boys were around, and he never saw any inappropriate conduct. Inman helped other people many times.

3
4
5
6

Frank Rust checked his records and verified that on September 19, 1998, the night before the Raiders/Broncos football game, there was a stock car race in Stockton and it ended about midnight. Inman was at the race. After the race, Inman accompanied Frank Rust and his wife to a restaurant to eat. Inman became upset because Frank Rust got more food than he did. Inman said he was going to a Raiders game the next day. Frank Rust did not believe Inman missed any races during the Stockton racing season.

7
8
9

Sybil Ann Rust, Frank Rust's wife, through reviewing newspapers and thinking about what had happened, determined that she and her husband were with Inman at the races in Stockton on September 19, 1998. Sybil Rust believed that Inman was at the races that night because she checked to see if there was a race.

10
11

Anthony George Major is married to the Rusts' daughter. Major used to work the night shift at a restaurant. He recalled the last time the Rusts came into the restaurant while he was working the night shift. Inman was with the Rusts. Major recalled Inman joking about not getting extra food like Major gave to Frank Rust.

12
13
14
15

Craig M. (approximately 27 at time of trial) testified he is Inman's friend and part of his pit crew when Inman races. He usually went to eat with the Rusts and Inman after the races. He remembered Inman joking with Major about Frank Rust getting extra food at the restaurant. That was a night that Inman did not race, so Craig M. did not go to the races but met with the group at the restaurant after the race. This occurred in mid-September, but he does not recall which year. He recalled that Inman was going to the Raiders/Broncos game the following day.

16
17
18

Craig M. also recalled an incident when he was at Inman's house playing a game with several other kids. Two of the kids went into a back bedroom after they were out of the game. A short while later he heard Inman reprimanding the kids. He has never seen Inman acting inappropriately with children.

19

Craig M.'s mother testified that she and her sons lived next door to Inman in the past. She never had any concerns about her children being with Inman.

20
21
22
23
24

Inman's sister, Peggy Inman, testified she lost her hearing in 1999. From 1995 to 1997 Peggy Inman lived with Inman, and from 1997 to 1999 she lived in a house behind Inman's house but on the same property. She would have been able to hear a loud scream from Inman's house when she lived behind him. She remembered Inman going to Monterey on November 11, 1998, the day before her birthday, to pick up a vehicle for a friend. Inman returned home around 9:00 p.m. Inman took Victim # 4, Victim # 2 and Victim # 2's brother with him. When they returned, Victim # 4 waited outside while Inman put Victim # 2 and his brother to bed. Inman then took Victim # 4 home.

25

26   / / /

8

Peggy Inman remembered Inman taking Victim # 3 to a football game, but she is certain that Victim # 3 did not spend the night with Inman because he was racing.  She didn't recall if Victim # 3 went to more than one game with Inman.  She remembered Victim # 3 using the hot tub on one occasion after he had gone to a football game with Inman.

Peggy Inman also knew Victim # 4 and Austin.  She heard Victim # 4 and Austin in the hot tub and heard someone go into the swimming pool.  She also saw Victim # 4, Austin and Inman in the hot tub.

Ann D. testified that she met Inman through a mutual friend.  Inman spent time with her son, Matthew, starting when her son was about 11 or 12, because they both had an interest in cars.  Her son always liked spending time with Inman.

Matthew testified that he has known Inman since he was about 11 years old.  He enjoyed working on cars with Inman and was on Inman's race car pit crew for a while.  He recalls playing strip poker when he went camping with Inman, Victim # 1 and Victim # 1's brother.  Only the three boys played strip poker.  Inman said that during the night Victim # 1 crawled into his sleeping bag with him.  Inman never touched Matthew inappropriately, showed him pornography, or made any suggestions of a sexual nature to him.

Carol K. testified that her son played soccer on Inman's team for two years.  She also was the team mom and would talk with Inman about two or three times a week during the season.  She also was aware that Victim # 2 had accused Inman of molesting him.  Inman said that Victim # 2 was actually talking about his biological father.  As a result of the accusations, she watched Inman closely and did not observe any inappropriate behavior.

Zachary S. testified that he played soccer on Inman's team for two years.  He never saw Inman do or say anything inappropriate.  He did hear Inman say that Victim # 3 couldn't squirt yet.  They were discussing penises at the time.

Kimberly C. was one of the team moms, and her son played soccer on Inman's team.  She did not notice any inappropriate behavior between Inman and the team players.

Brandon is Kimberly C.'s son.  He played on Inman's soccer team for three years.  He never noticed Inman act inappropriately.

Victim # 1's brother testified that he played on Inman's soccer team for two years, 1995 and 1996.  He recalled going camping with Inman, Victim # 1 and Matthew.  It was Victim # 1's idea to play strip poker.  Inman also played the game.  Inman told Victim # 1's mother that Victim # 1 had tried to get into Inman's sleeping bag.  He never saw Inman act inappropriately.  He did see a pornographic movie while at Inman's house.  Inman watched the video with him and Victim # 1.

Ronald Meister is a licensed psychologist.  He testified at length about the best method for conducting an unbiased interview of children to obtain the most reliable testimony.

Jonathan was on Inman's soccer team in 1999 and 2000, and considered Inman to be a friend.  A detective interviewed Jonathan and tried to force him to say he had sex with Inman.  Jonathan never had any inappropriate contact with Inman.

9

Victim # 5's mother testified that Victim # 5's brother played on Inman's soccer team. She learned that Inman was arrested and became frantic. She asked her sons whether Inman had done anything to them that they thought was inappropriate. Victim # 5 said there was some inappropriate tickling.

Martha T. met Inman through Big Brothers Big Sisters. Inman was her son's "big brother." After Inman was arrested, she asked her son if anything inappropriate had occurred with Inman. Her son said nothing happened. Her son testified that nothing inappropriate happened.

Megan's brother was on Inman's soccer team with Victim # 1. Megan went to the lake with her brother, Inman, Victim # 1 and others. While Megan was riding an inner tube behind the boat, Victim # 1 pulled down his pants and displayed his buttocks. He also grabbed his groin area.

Donald V. Hutchins is the chief of police with the City of Gustine. He also was a referee for the local youth soccer league. He was the referee at many games involving Inman's soccer teams. His department did not have any reports of inappropriate behavior involving Inman.

Craig S. lived next door to Inman years ago. He played soccer on Inman's team and went camping with Inman on several occasions, usually with several other kids. Just before he got married, he and his future wife moved into the second house on Inman's property. He frequently saw a group of boys hanging around Inman's house. One time when Victim # 1 and Victim # 1's brother were at Inman's house, Craig S. let them look at a pornographic movie. Inman took them out of the house as soon as he discovered what the boys were seeing. Craig S. has never seen Inman act inappropriately around young boys.

Craig S.'s mother testified Inman moved next door to them when her son was about 11 years old. Her family had a lot of interaction with Inman. She did not think that Inman would molest young boys.

Lidia Parman met Inman through the soccer league. She was the secretary for the league when Inman was a coach. She never received any complaints about Inman. She never saw any inappropriate behavior by Inman.

Jerry F. Goodeyon met Inman at the racetrack. His son would help Inman work on his race car. He never saw Inman act inappropriately.

Dawn Gay Inman is another of Inman's sisters. She remembered Inman returning home from Monterey with the car. Inman put his two kids to bed and then immediately took Victim # 4 home. She was on the boat when the incident with Megan and Victim # 1 occurred. Victim # 1 was always doing disgusting things. She also spent a lot of time with Victim # 2. Victim # 2 told her that his natural father, not Inman, had touched his penis. Dawn Inman also heard several phone messages from Victim # 4 shortly before Inman was arrested.

/ / /

/ / /

/ / /

/ / /

1
    **B.**   <u>Procedural History</u>

2
    Petitioner was charged with 17 counts of lewd and lascivious acts on a child under

3
the age of fourteen (counts 1-7 and 9-18); two counts of exhibiting harmful material to a minor

4
for the purpose of seducing the minor (counts 9 and 19); one count of attempting to exhibit

5
harmful material to a minor (count 20); and one count of possessing computer images of a minor

6
engaging in or simulating sexual conduct (count 21).  Counts 8 and 16 were subsequently

7
dismissed.  Following a jury trial, petitioner was convicted on all remaining counts as charged,

8
except as to counts 17 and 18 the jury found petitioner guilty of the lesser-included offense of

9
misdemeanor simple assault.  The jury found true the special allegation that petitioner had

10
committed lewd and lascivious acts on more than one victim.

11
    Petitioner was sentenced to an aggregate term of 61 years to life in prison.

12
Petitioner's conviction and sentence were affirmed on direct appeal and the California Supreme

13
Court declined review.[2]  Petitioner filed a number of state court post-conviction actions.  The

14
Stanislaus County Superior Court recited the following procedural history pertaining to

15
petitioner's post-conviction actions:

16
> Petitioner filed a series of similar Habeas writs before both the
> Superior Court and Appellate Court, all challenging his jury trial

17
> conviction . . . .  Initially, the writ was denied since the conviction was not
> final on appeal.  After the conviction was affirmed, the Appellate Court

18
> first requested a declaration from Petitioner's trial counsel, Mr. Ernie
> Spokes, and then later remanded the matter for an evidentiary hearing on

19
> the grounds in the writ.  The grounds stated are essentially the same in all
> writs, with only the order varying.

20

21
After conducting an evidentiary hearing, the Stanislaus County Superior Court issued a 22-page

22
decision on June 7, 2007, denying habeas relief.  The California Court of Appeal and California

23
Supreme Court likewise denied habeas relief.

24
        [2]    The California Supreme Court denied the petition without prejudice to any relief

25
which might be available after it decided in separate the effect, if any, of <u>Blakely v. Washington</u>,
124 S.Ct. 2531 (2004), on California law.  Otherwise, the California Supreme Court's denial was

26
not accompanied by any citation or analysis.

1

## II.  STANDARDS OF REVIEW

2          Because this action was filed after April 26, 1996, the provisions of the

3    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

4    applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

5    (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

6    does not, however, apply in all circumstances.  When it is clear that a state court has not reached

7    the merits of a petitioner's claim, because it was not raised in state court or because the court

8    denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

9    habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

10   2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

11   petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

12   (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

13   perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

14   evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

15   petition de novo where state court had issued a ruling on the merits of a related claim, but not the

16   claim alleged by petitioner).  When the state court does not reach the merits of a claim,

17   "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

18          Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

19   not available for any claim decided on the merits in state court proceedings unless the state

20   court's adjudication of the claim:

21                  (1) resulted in a decision that was contrary to, or involved an
                    unreasonable application of, clearly established Federal law, as determined
22                  by the Supreme Court of the United States; or

23                  (2) resulted in a decision that was based on an unreasonable
                    determination of the facts in light of the evidence presented in the State
24                  court proceeding.

25   Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is

26   "contrary to" or represents an "unreasonable application of" clearly established law.  Under both

12

1    standards, "clearly established law" means those holdings of the United States Supreme Court as

2    of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006)

3    (citing Williams, 529 U.S. at 412) .  "What matters are the holdings of the Supreme Court, not

4    the holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en

5    banc).  Supreme Court precedent is not clearly established law, and therefore federal habeas

6    relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742,

7    753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)).

8    For federal law to be clearly established, the Supreme Court must provide a "categorical answer"

9    to the question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a

10   state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

11   contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

12   created by state conduct at trial because the Court had never applied the test to spectators'

13   conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's

14   holdings.  See Carey, 549 U.S. at 74.

15            In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

16   majority of the Court), the United States Supreme Court explained these different standards.  A

17   state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

18   the Supreme Court on the same question of law, or if the state court decides the case differently

19   than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

20   court decision is also "contrary to" established law if it applies a rule which contradicts the

21   governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

22   that Supreme Court precedent requires a contrary outcome because the state court applied the

23   wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

24   Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

25   id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

26   determine first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040,

1    1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

2    case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

3    is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

4            State court decisions are reviewed under the far more deferential "unreasonable

5    application of" standard where it identifies the correct legal rule from Supreme Court cases, but

6    unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

7    510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

8    that federal habeas relief may be available under this standard where the state court either

9    unreasonably extends a legal principle to a new context where it should not apply, or

10   unreasonably refuses to extend that principle to a new context where it should apply.  See

11   Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

12   decision is not an "unreasonable application of" controlling law simply because it is an erroneous

13   or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

14   75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found

15   even where the federal habeas court concludes that the state court decision is clearly erroneous.

16   See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

17   deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

18   As with state court decisions which are "contrary to" established federal law, where a state court

19   decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

20   unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

21           The "unreasonable application of" standard also applies where the state court

22   denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

23   848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).  Such decisions

24   are considered adjudications on the merits and are, therefore, entitled to deference under the

25   AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

26   The federal habeas court assumes that state court applied the correct law and analyzes whether

the state court's summary denial was based on an objectively unreasonable application of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

## III.  DISCUSSION

Petitioner raises the eight grounds for relief (some with numerous sub-claims) as follows: Ground 1 – The seizure of defense counsel's investigator's computer resulted in violation of his right to private consultation with counsel and constituted prosecutorial misconduct; Ground 2 – The Stanislaus County Superior Court failed to properly conduct state habeas corpus proceedings following the California Court of Appeal's remand for an evidentiary hearing; Ground 3 – Ineffective assistance of trial counsel; Ground 4 – Prosecutorial misconduct; Ground 5 – The trial court committed "jurisdictional and prejudicial errors"; Ground 6 – The trial court erred in imposing consecutive sentences based on facts not found by a jury; Ground 7 – Ineffective assistance of appellate counsel; and Ground 8 – The Stanislaus County Superior Court erred in denying habeas corpus relief.  Respondent concedes that all of petitioner's claims are exhausted.

### A.    Seizure of Investigator's Computer (Ground 1)

Petitioner argues that the trial court violated state law when it "did not appoint a Special Master when it issued the search warrant for evidence in the control of Petitioner's trial attorney."  According to petitioner, the seizure violated his right to confidential assistance of counsel because it violated the attorney-client and/or work product privileges.  Regarding this claim, the state court recited the following background facts:

> Alan Peacock is a private investigator retained by Inman's attorney at the beginning of the case.  (footnote omitted).  Peacock was being investigated to determine whether he had committed any crime in relation to the estate of Raymond Aho, for which Peacock was the court-appointed administrator.  Pursuant to this investigation, a search warrant was obtained to seize Peacock's home and office computers.  The search also resulted in the seizure of numerous computer disks on which Peacock stored information about the cases on which he was working.

The seizure occurred on August 14, 2001.  Later that afternoon the trial court issued an order requiring the district attorney's office to turn over the computer and all related information to the court.  This was accomplished no later than the afternoon of August 15, 2001.

Peacock testified that he had interviewed Inman in connection with his case and there was information from that interview on the seized computer.  The People presented testimony from one of the officers working on the case that an exact image had been made of the hard drive from one of Peacock's office computers and one computer disk was copied.  Nothing else was copied because the trial court issued an order preventing any further work on the computer.  The copies were turned over to the trial court, along with all the original hardware and computer disks.  The officer testified that no files were opened or read during the time the computers were in the possession of the district attorney's office.

The court added: "Inman acknowledges that there is no evidence that the district attorney's office, or anyone connected to the investigation, reviewed any of the investigative material."

Petitioner argued to the state court that some kind of misconduct must be presumed because the district attorney's office had possession of the materials for 24 hours.  In denying the claim, the court held:

In this case, the undisputed evidence is that the prosecution did not obtain any information regarding the defense case.  There is only speculation that either an officer committed perjury or someone else in the district attorney's office violated the trial court's order precluding any review of the information on Peacock's computer. . . . [¶] . . . Thus, while there is merit to the contention that the district attorney had privileged information in its possession, there was no misconduct because the district attorney never reviewed the information in the first instance.

As to the requirement under state law of using a special master, the court held:

Moreover, even if Peacock was covered by section 1524, subdivision (c)(1), the statute provides a special master must be appointed when the subject of the search is not reasonably suspected of engaging in criminal activity.  Peacock's office was searched, and the computers seized, because he was suspected of a criminal offense.  Nothing in the record suggests that the prosecution's investigation [into Peacock] was not reasonable.

/ / /

/ / /

/ / /

1     To the extent plaintiff's federal claim is based on an alleged error in state law, the

2 claim is not cognizable.  A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the

3 basis of a transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768

4 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is

5 not available for alleged error in the interpretation or application of state law.  Middleton, 768

6 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

7 Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state

8 issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

9     As to plaintiff's assertion of presumed misconduct because the prosecutor had

10 access to the seized materials, success on a claim of prosecutorial misconduct requires a showing

11 that the conduct so infected the trial with unfairness as to make the resulting conviction a denial

12 of due process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).  Here, there is no showing that

13 the prosecutor ever reviewed the materials in question.  Thus, there can be no showing that the

14 prosecutor's mere possession of the materials infected the trial with unfairness.

15     **B.    Ineffective Assistance of Trial Counsel (Ground 3)**

16     In Ground 3, petitioner argues that trial counsel was ineffective in the following

17 ways:  (1) trial counsel failed to present evidence, in the form of a forensic report, that there were

18 "No physical findings" of abuse as to one of the alleged victims; (2) trial counsel failed to present

19 evidence that one of the complaining victims had a mental disorder; (3) trial counsel failed to

20 present evidence, in the form of psychological reports, which indicated that one of the alleged

21 victims, when in trouble, would fabricate false claims; (4) trial counsel failed to raise a statute of

22 limitations argument; (5) trial counsel failed to present evidence, in the form of a cancelled

23 check, that would have established various alibis; (6) trial counsel failed to present evidence, in

24 the form of witness testimony, contradicting a complaining victim's statement that petitioner

25 purchased gasoline at the "E.R. Vine" gas station; (7) trial counsel failed to present evidence to

26 impeach a complaining witness testimony; (8) trial counsel failed to address problems with

Count 16; (9) trial counsel failed to argue lack of jurisdiction as to certain counts; (10) trial

counsel failed to investigate the bases for Counts 19 and 20; (11) trial counsel failed to present

any evidence regarding petitioner's "involvement with 'Dateline'"; (12) trial counsel failed to

interpose any objections based on petitioner having been viewed by the jury entering and leaving

the courtroom in shackles; (13) trial counsel failed to investigate witnesses who could refute the

statements made by a "jailhouse snitch"; (14) trial counsel failed to offer evidence, in the form of

videotape victim interviews, to impeach their testimony; (15) trial counsel failed to notify the

court that two of the complaining victim witnesses were being coached "while they testified by a

man in the audience. . ."; (16) trial counsel refused to allow petitioner to testify in his own

defense at trial; (17) trial counsel "failed to include Petitioner's presence during in limine

motions. . ."; (18) trial counsel failed to resolve an issue related to <u>Brady v. Maryland</u>, 373 U.S.

83 (1963); (19) trial counsel erred in focusing the defense case on police interview techniques;

(20) trial counsel failed to request any jury instructions on a "limited defense of alibi"; (21) trial

counsel admitted that he was incompetent; and (22) trial counsel failed to object to the

imposition of consecutive sentences.

   The Sixth Amendment guarantees the effective assistance of counsel.  The United

States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

<u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

all the circumstances, counsel's performance fell below an objective standard of reasonableness.

<u>See</u> <u>id.</u> at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to

have been the result of reasonable professional judgment.  <u>See</u> <u>id.</u> at 690.  The federal court must

then determine whether, in light of all the circumstances, the identified acts or omissions were

outside the wide range of professional competent assistance.  <u>See</u> <u>id.</u>  In making this

determination, however, there is a strong presumption "that counsel's conduct was within the

wide range of reasonable assistance, and that he exercised acceptable professional judgment in all

significant decisions made." <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing

1   Strickland, 466 U.S. at 689).

2   　　　　Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

3   at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

4   unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

5   reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

6   see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

7   determine whether counsel's performance was deficient before examining the prejudice suffered

8   by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

9   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

10  followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

11  697).

12  　　　　1.　　Forensic Report

13  　　　　The state court discussed this claim as follows:

14  　　　　　　Counts 6 and 7 allege that Petitioner committed lewd and
    lascivious acts with his foster son "Kenny" between January 1, 1996, and
15  January 22, 1999.  These allegations were initially investigated by
    Sergeant Mike Borges of Ceres PD in January 1999.  As part of that
16  investigation, Dr. Lee Herskowitz conducted a forensic child abuse exam
    on "Kenny."  One of the findings on the report stated "No physical
17  findings."  Sgt. Borges closed his case without prosecution at that time
    because of other behavioral issues with "Kenny" and a suspicion that the
18  times when the alleged abuse occurred corresponded to times when
    "Kenny" was in trouble.  Later, in late 2000 early 2001, when numerous
19  other such complaints surfaced from the boys on the various soccer teams
    which Mr. Inman coached, Sgt. Borges reopened the investigation and
20  forwarded it to the new detective.
    　　　　Mr. Inman alleges in his petition that the failure of [trial counsel]
21  Mr. Spokes to locate and call Dr. Herskowitz to the stand at the trial was
    incompetence because the statement of "No physical findings" in the
22  report was "exculpatory and/or exonerating."  Mr. Spokes testified that he
    did not speak with Dr. Herskowitz prior to the trial, as he had moved out
23  of state since the time of the exam, but that he was very familiar with Dr.
    Herskowitz, who was, at the time of the exam, a leading advocate for child
24  abuse prevention in the county and routinely volunteered to do forensic
    exams for the prosecution.  Mr. Spokes was familiar with many occasions
25  on which Dr. Herskowitz had testified, and knew that he routinely stated
    that physical findings are rare, and there is no significance to the absence,
26  only to the presence of physical findings.  In fact, Dr. Herskowitz had also

checked the finding in his report that the "exam was consistent with the
history." The "history" that "Kenny" gave to Dr. Herskowitz was of
multiple molests including sodomy and oral copulation by the Petitioner,
Ron Inman, over an extended period of time. Thus, Mr. Spokes concluded
that any testimony that Dr. Herskowitz would give would be far more
damaging than helpful, and time spent trying to locate him could be better
spent on preparing other aspects of the case.

The state court denied the claim, finding no deficient performance on the part of trial counsel. In

light of the circumstances outlined by the state court, this court also concludes that counsel's

actions were reasonable. There was no misconduct because counsel made a reasoned tactical

decision with respect to Dr. Herskowitz.

### 2.   Evidence of Victim's Mental Disorder

In denying this claim, the state court held:

Counts 1-5 allege that Inman committed acts in violation of § 288
with "Brian" between November 6, 1994, and November 5, 1996, when
"Brian" was 11 or 12. "Brian's" older brother was also on Inman's soccer
team. Later, "Brian" also joined the team. "Brian" recalled spending
several nights at Inman's house, where Inman's sister Peggy also lived.
"Brian" could not remember which specific occasions he was there on.
"Brian" recounted a number of occasions when Inman fondled him,
including one time when "Brian" was taking a bath, and one time when
"Brian" was sleeping in Peggy's bed while she was away. Another time,
he was watching a pornographic video with Inman in Inman's bedroom,
and Inman pulled down his pants and asked "Brian" to fondle him. Later,
Inman attempted to have anal intercourse with "Brian." On each occasion,
"Brian" stopped the activity soon after it started. On another occasion
when "Brian," his older brother, and another boy were camping with
Inman, after they had all been playing "strip poker," Inman asked "Brian"
to share his sleeping bag. When "Brian" refused, Inman got into "Brian's"
sleeping bag.

In his writ, Inman alleges that Mr. Spokes "was aware of"
"Brian's" "mental disorder" and of "his making false statements to law
enforcement about like crimes and that the dates on the complaint did not
coincide with the allegations." At the hearing, however, Inman did not
present any evidence of prior false claims of sexual abuse by "Brian" or
any fatal discrepancies in the alleged dates of the occurrences. Nor did he
present any evidence that "Brian" did have a "mental disorder" or specify
any witnesses that Mr. Spokes could have contacted to investigate this
allegation. Mr. Spokes testified that Inman did tell him that he believed
that "Brian" was taking medication regularly for ADD, but could give no
specific information about treatment providers or witnesses. When Mr.
Spokes' investigator Stan Ross attempted to contact "Brian's" parents,
they declined to talk with him.

1
2
3
4
5

> Mr. Spokes did present evidence at trial of behavioral problems involving "Brian," including the testimony of one of the boys present on the camping trip that it was "Brian's" idea to play strip poker, testimony about another water skiing trip where "Brian" "mooned" another girl there, and testimony from one of Inman's sisters that "Brian" was always doing disgusting things.
>
> The Court finds no incompetence relating to "Brian" or any significant difference such evidence would have made.

6   The court agrees with the state court that there was no prejudice.  Even if "Brian" did have a

7   mental disorder, and even if "Brian" took medication for ADD, and even if "Brian" had

8   behavioral problems, and even if "Brian" initiated the game of stip poker, and even if "Brian"

9   "mooned" some girls, and even if "Brian" "was always doing disgusting things," none of this

10  would provide a defense to the charges of child molestation.  The court is particularly disturbed

11  by petitioner's notion that, had the jury been presented with evidence that "Brian" was sexually

12  adventurous (i.e., by suggesting the game of strip poker, or "mooning" girls, or "doing disgusting

13  things"), the jury would have excused petitioner's criminal conduct.

14          3.      Psychological Reports

15  The state court discussed this claim as follows:

16
17
18
19
20
21
22
23

> When "Kenny" was taken out of his natural parents' home in 1996, prior to the adoption of "Kenny" by Mr. Inman, Social Worker Kathy Causey requested Dr. Barry Olson of Psychiatric Medical Group to prepare a psychological evaluation of "Kenny."  This report was ordered for the purposes of determining "Kenny's" adoptability.  The report paints an all too familiar picture of a significantly emotionally disturbed child who has suffered more than his share of deprivation and "a wide range of abusive experiences."  He acts out frequently, is aggressive, and "presents a wide range of behavioral problems."  Nonetheless, Dr. Olson concludes that "Kenny" seems "likely to be able to bond in a family in a positive way."
>
> Mr. Inman asserts that this report bore directly on "Kenny's" veracity and it was error not to introduce it or call the doctor.  Mr. Spokes testified that he felt it was too remote in time and did not see what it had to do with veracity.

24  The state court concluded that, because the Olson report did not relate to veracity, trial counsel's

25  decision not to pursue it was a reasoned tactical decision and did not amount to misconduct.

26  This court agrees.

21

The state court also addressed petitioner's claim that other psychological reports –
by Drs. Johnson and Kempf – should have been offered by trial counsel:

> Soon after his adoption by Petitioner Ron Inman and before the
> initial investigation of child abuse allegations by Sgt. Borges, Mr. Inman
> enrolled "Kenny" in the local Parents United program, operated by Dr.
> Debby Johnson, a personal acquaintance of Mr. Inman's. When Sgt.
> Borges began his investigation in January 1999, a parallel proceeding was
> apparently initiated (or contemplated) pursuant to [California Welfare &
> Institutions Code] § 300. Mr. Inman received a letter from Dr. Johnson
> which stated that sometimes in group "Kenny" would "substitute adoptive
> father . . . as his offender whenever he was on restriction or was about to
> be on restriction. Once he was off restriction, he would again return to
> talking about natural father. . . ." She opined that she found his reports to
> be "opportunistic rather than credible." As a result of his naming Ron
> Inman, however, she did direct one of her associates to evaluate "Kenny"
> "to determine what is motivating this report." Thereafter, James Kempf, a
> counseling psychologist, evaluated "Kenny" for the Department of Social
> Services. In his report to Social Services, he stated "I don't know that I
> have ever seen such a clear report of child molestation that I have ever
> doubted."
> 
> Mr. Inman asserts that it was incompetence on Mr. Spokes' part
> not to call Dr. Johnson and Dr. Kempf as witnesses in the case. Mr.
> Spokes testified that he was well aware of the need to get this information
> in front of the jury. However, he had serious misgivings about calling Dr.
> Johnson as a witness. Since she was one of the biggest providers of sexual
> offender and victim counseling services for the county, and an outspoken
> advocate in the community for child abuse prevention, he suspected she
> might be a bit sensitive about the fact that her letter about Mr. Inman was a
> primary factor in Detective Borges' decision to close his investigation
> without prosecution, which allowed Mr. Inman to continue as coach of the
> various soccer teams which later gave rise to numerous independent
> molest allegations by the boys on the team. And, in fact, when Mr. Spokes
> contacted her to discuss the matter, she refused to talk to him. He decided
> not to call her as a witness if he did not know what she would say because
> she would certainly be a "loose cannon."
> 
> As to Dr. Kempf's report, Mr. Spokes testified that while he was
> very interested in getting in the Doctor's statement doubting "Kenny's"
> credibility, the rest of the report was very much a two-edged sword that
> might very well be more damaging than helpful. Dr. Kempf noted that,
> without any prompting, "Kenny" disclosed to him that he had been
> sodomized by both his natural father and Ron Inman and "clearly states"
> that he was sodomized 8 times by Ron Inman. Dr. Kempf noted also that
> even though he felt "Kenny" had lied about some things, "I should qualify
> this answer by saying that I am *not* certain Mr. Inman did not molest
> Kenny." He also added "I firmly believe that Kenny has been sodomized.
> I don't know that I can conclusively name or rule out any offender for
> Kenny. I think it possible that Kenny was molested by a previous father
> figure in foster care. It is also possible that Mr. Inman has offended." "I
> believe that Kenny is telling the truth as he recalls it." "I do not believe

> Kenny should be returned to Mr. Inman's care at this time."
>
>     Faced with this apparent dilemma, Mr. Spokes adopted a completely different tactic. Rather than call either Dr. Johnson or Dr. Kempf directly, he cross-exmained Sgt. Borgen about the parts of their reports which Sgt. Borges relied upon in closing the investigation that cast doubt on "Kenny's" complaints. (RT p. 461-2). In this way he got the part of the report favorable to Mr. Inman indirectly in front of the jury without disclosing the unfavorable parts. The Court finds this to be not only a reasonable tactical choice, but a downright clever one.

This court can find no flaw in the state court's analysis and agrees that trial counsel's solution was indeed quite clever.

### 4.   Statute of Limitations

Petitioner contends: "In Ct. 8, Trial counsel was aware that the alleged crime was charged beyond the statute of limitations, yet failed to address it prior to trial and complainant testifying." This claim was not addressed by the California Supreme Court when it denied habeas relief without comment or citation. As respondent correctly notes, where the state court denies a claim without providing any reasoning at all, this court reviews to determine whether the state court's denial was an objectively unreasonable application of clearly established federal law. As respondent also notes, the record clearly demonstrates that Count 8 was voluntarily dismissed by the prosecutor based on the statute of limitations. Because petitioner was never convicted on Count 8, it cannot be said that he is in custody with respect to any constitutional error relating specifically to that count. Therefore, this court cannot grant relief. See 28 U.S.C. § 2254(a). Furthermore, this court finds that the state court's rejection of petitioner's argument of constitutional error with respect to a dismissed claim was not unreasonable by any standard.

### 5.   Cancelled Check

Regarding this claim of ineffective assistance of counsel, the state court held:

> Counts 9 and 10 allege that on September 19, 1998, Inman committed a lewd act . . . with "Andrew," a member of Mr. Inman's soccer team, while he was visiting at Mr. Inman's home. Inman alleges that he gave Mr. Spokes "documentation [a check and the corresponding check register] that strongly corroborated" trial testimony that he was at the Stockton Speedway at the time the molest was supposed to have occurred at Mr. Inman's house. He further alleges that Mr. Spokes was incompetent

23

1    in not presenting such evidence to the jury.

2            Mr. Spokes agreed that Mr. Inman did give him the documents and
     that he did not attempt to introduce then at the trial, although he did put on
3    four other witnesses to corroborate the alibi.  However, as to the check, he
     pointed out to Mr. Inman that the check is dated September 20th, not the
4    19th, the date of the molest.  Since the date of the molest was exactly fixed
     by reference to a professional football game that the two attended the next
5    day, Mr. Spokes testified that he told Mr. Inman that the check would have
     little corroborative value with the wrong date on it.  He testified that Mr.
6    Inman explained the discrepancy to him by stating that he wrote the check
     just after midnight at the Speedway, so dated it the 20th, not the 19th.
7    However, when Mr. Spokes examined the check register to confirm this,
     he noted that there were four other check to four other businesses written
8    on the 20th *preceding* the Stockton Speedway check.  Thus he concluded
     that the jury would consider this testimony highly suspect and damaging to
9    any chance the alibi defense might have.  Both the check (#5748) and the
     register were submitted at the Habeas hearing as exhibits 9 and 47
10   respectively and confirmed Mr. Spokes' testimony.  Thus the Court
     concludes that there clearly was no incompetence in the failure to present
11   these items at trial.

12   The cancelled check was an issue counsel wisely chose to avoid.  As the state court observed,

13   and as Mr. Spokes informed petitioner, the check is dated September 20th – the day <u>after</u>

14   petitioner molested "Andrew."  Petitioner's "explanation" regarding dating the check would have

15   certainly been rejected by the jury given evidence the prosecution would certainly have

16   introduced about the prior check also dated September 20th.  Contrary to petitioner's assertion

17   that the cancelled check corroborated his alibi, it would have actually undermined it given the

18   inconsistencies Mr. Spokes found.

19                    6.    <u>E.R. Vine Gas Station</u>

20   This claim was addressed by the Stanislaus County Superior Court as follows:

21            In Counts 11 and 12, victim "John" claimed that, prior to leaving
     on a trip with Inman, Inman drove to a specific gas station to fill up with
22   gas.  At trial, "John" did not give any more specific information about the
     particular gas station (RT p. 135).  However, in an earlier statement to
23   Detective Kemp Van Ee, he thought he recalled Inman paying with a card.
     During that recorded interview, the Detective spent considerable time with
24   "John" trying to narrow down which gas station it was, by referring to a
     city map.  Eventually, the Detective decided that "John" must have been
25   referring to an "E.R. Vine" station in Ceres, which is a "card lock"station
     (commercial accounts payable by card only).  However, when Detective
26   Van Ee went to this station, he found that Inman did not have an account

                                          24

there.

Inman asserts that it was incompetence not to call the manager of the E.R. Vine station as a witness to testify that Inman did not have an account there. Mr. Spokes testified that, given the lack of specificity in the trial testimony, this would have been collateral since it would only have impeached the earlier statement, not the testimony. Further, it was actually the Detective's conclusion that the station "John" was referring to was "E.R. Vine," not "John's" actual recollection, so it did not actually impeach that either. At any rate, Spokes did elicit testimony from family members that Mr. Inman did not have accounts at any of the gas stations in that area.

The Court believes that the Detective was looking for specificity where none existed. Thus the testimony of the manager would have had little or no value, and the decision not to call him was reasonable under the circumstances.

The court finds that, as with the cancelled check, this is another red herring offered by petitioner as a basis for federal habeas relief. "John" never testified which gas station petitioner used that day. Nor did "John" ever offer any trial testimony regarding a card or account. It was the detective who took information from an earlier vague statement from "John" and concluded based on his own investigation that "John" must have ben referring to the E.R. Vine station in Ceres. Whether petitioner had an account at that particular station is irrelevant given that "John" never specified a particular station. Therefore, counsel was not incompetent for avoiding litigating this collateral issue (which the trial judge likely would not have allowed in any event). Furthermore, petitioner was not prejudiced because trial counsel elicited testimony from other sources that petitioner did not have accounts at any of the area gas stations.

7. <u>Impeachment Evidence</u>

As to this claim, the state court held:

Counts 13, 14, and 15 involve separate occasions when "John" alleged that Inman molested him. On one occasion, following a trip to Monterey, Inman sent his 2 foster sons to bed, and Inman and "John" went into the guest room and played video games. "John" stated that Inman fondled his penis on that occasion.

On another occasion at Inman's house, "John" was lying on a bed playing a video game and Inman pulled up "John's" shirt, rubbed his stomach, and fondled his penis, eventually putting "John's" penis in his mouth.

/ / /

1
2
3
4
5
6
7
8
9

> On a third occasion, before a ski trip, "John" and his friend "Austin" were at Inman's. "John" and Inman were in the hot tub. Inman fondled his penis in the hot tub, then again later when "John" was changing into his pajamas, and again when "John" had gone to bed.
> Inman alleges that he "informed trial counsel of a witness who could refute all of the complaining witnesses [sic] allegations" in these counts and that Spokes did not present this testimony to the jury. Mr. Inman did not present or identify the supposed "witness who could refute" these allegations anytime during the habeas hearing, or give any indication as to whom he was referring in his petition. However, the record shows that Spokes did present the testimony of Dawn Inman, who remembered that when Inman returned from Monterey, he immediately took "John" home and did not invite him into the house to play video games. He also presented the testimony of Peggy Inman, who testified to seeing John, Austin, and Inman in the hot tub.
> The Court finds that Petitioner did not establish any deficiency on trial counsel's part or any prejudice to his case in regard to this allegation.

10 As the state court notes, petitioner never presented Mr. Spokes or that court with the names of

11 the supposed witnesses who could refute the facts alleged in counts 13, 14, and 15. Nor does

12 petitioner present those names now to this court. Without more facts, petitioner's claim is

13 conclusory and this court cannot say that the state court's denial was objectively unreasonable.

14             8.      Dismissal of Count 16

15             Petitioner argues: "In Ct. 16, Trial counsel possessed the police report and video-

16 taped interview in which the person named in the complaint denied any wrongdoing on

17 Petitioner's part, yet failed to address the charge prior to trial. . . ." As petitioner concedes, and

18 as the record demonstrates, Court 16 was dismissed. Therefore, petitioner cannot be in custody

19 pursuant to a constitutional violation with respect to that count. For this reason, federal habeas

20 relief cannot be granted. See 28 U.S.C. § 2254(a). Furthermore, the California Supreme Court's

21 silent denial of this claim was not objectively unreasonable given that Count 16 had been

22 dismissed.

23 / / /

24 / / /

25 / / /

26 / / /

9.      Jurisdiction

Petitioner claims that trial counsel was ineffective for failing to properly raise the argument that the court lacked jurisdiction over certain counts.  In denying this claim, the state court reasoned as follows:

> Counts 17 and 18 involve § 288 charges arising out of a trip where "Stefan" accompanied Inman to a football game in Oakland between the Raiders and Seahawks.  "Stefan" was the brother of a member of the soccer team Mr. Inman coached.  On the way to the game, "Stefan" stated that Inman was tickling his leg, and would occasionally touch his penis.  The same thing happened various times during the game as well.  At the close of the People's case, Mr. Spokes moved to dismiss Counts 17 and 18, arguing that they occurred, if at all, outside the jurisdiction of the Stanislaus County Court.  The Court denied this motion (CT 136) but allowed Mr. Spokes to argue the issue to the jury, and instructed the jury in the language of PC § 781, 784.7, and CALJIC 2.50.2 (People's burden to prove proper jurisdiction) (CT 192-4).  The jury ultimately convicted Inman of the lesser included offense of PC § 240 of these two counts, impliedly rejecting the jurisdiction argument.  Mr. Inman was sentenced to time served on these two counts.
> Mr. Inman alleges that is was incompetence for Mr. Spokes to have waited until the People rested to make this motion, and that he should have made the motion prior to the time "Stefan" testified.  Mr. Inman did not specify what legal procedure is available to do this, and the Court is not aware of any.  It is clear that Mr. Spokes did everything he could to attack these counts based on the ambiguity relating to where the events actually occurred, but both the judge and the jury felt that the Court properly had jurisdiction.  Even if there was any error (assuming *arguendo*), Mr. Inman was not in custody on these counts at the time of bringing the writ, so there would be no relief available under the Habeas law.

Respondent is correct in stating that, because petitioner was sentenced to time served on the lesser-included offenses found by the jury on counts 17 and 18, petitioner is not in custody on those counts.  For this reason, the claim is not cognizable.  See 28 U.S.C. § 2254(a).

10.      Investigation Regarding Counts 19 and 20

Petitioner argues: "In counts 19-20, Trial counsel was aware that the two complainants, while interviewed by law enforcement, made no claims which would substantiate the information in the complaint, yet failed to investigate the areas on Petitioner's behalf."  This claim is conclusory given that petitioner does not state what investigation counsel should have done.  Nor does petitioner state how the victims' statements to law enforcement failed to include

27

1    any of the facts necessary to support counts 19 and/or 20.  Finally, it is clear based on the jury's

2    verdict that, regardless of what the victims said or didn't say to the interviewing law enforcement

3    officers, the victims' claims were substantiated by other evidence.  Thus, the court cannot say

4    that petitioner was prejudiced even assuming counsel was somehow incompetent for failing to

5    investigate.

6             11.    <u>Involvement with 'Dateline'</u>

7             Petitioner contends: "In Ct. 21, Trial counsel knew of Petitioner's involvement

8    with "Dateline" and of how his computer was implicated yet failed to investigate, such as contact

9    "Dateline" or conduct a search on the computer itself which was seized by Ceres Police."  The

10   California Court of Appeal addressed this claim as follows:

11                      As part of the investigation of the case, Ceres PD executed a search
                 warrant on Mr. Inman's house.  Among the items taken was a floppy disk
12               with the notation "Boys Secret Pages Porno Club" and handwritten notes
                 with internet addresses for web sites including "boysource.net,"
13               "lolitateen.com," "gayextreme.com," and "innocentboys.net."  Various
                 images involving young nude boys and girls and nude adult males
14               involved in sex acts were also found.  Some of the images had been
                 printed out and stored in Inman's desk.
15                      Also seized was a slip of paper with the address
                 "Dateline@NBC.com."  At the hearing, Inman testified that he told
16               Spokes that the reason he had the explicit web site addresses and pictures
                 was because he was working on an article he hoped to submit to NBC's
17               "Dateline."  Inman states that Spokes failed to follow up on it.
                         Spokes testified that when he got this information, he asked the
18               Central Valley Task Force (which did the forensic computer investigation
                 on Mr. Inman's hard drive for Ceres PD) to search for any e-mail or
19               documentary references to "Dateline" and they found none.  He further
                 cross examined the Detective about the failure of Ceres PD to investigate
20               this potentially exculpatory evidence on their own initiative originally. (RT
                 p. 605).  Mr. Inman's assertion to the contrary . . . is incorrect and not
21               supported by the trial record.
                         Given that Inman was not able to provide any other information to
22               Spokes to verify his claim, the Court finds Mr. Spokes' investigation of
                 this issue to be more than adequate.

23

24   Contrary to petitioner's assertion, trial counsel did in fact conduct a reasonable investigation.

25   When informed by petitioner that he was preparing a news article for submission to NBC,

26   apparently on child pornography, Mr. Spokes initiated a search of seized evidence for any

                                                     28

1  mention of a news article for NBC or "Dateline" and none was found.  Mr. Spokes also

2  questioned the detective about the failure of the police to investigate this issue on their own.  In

3  the absence of any further information from petitioner, Mr. Spokes wisely moved on to more

4  productive issues.

5         12.    <u>Shackles</u>

6         Petitioner contends that trial counsel was ineffective for failing to object to being

7  moved to and from the courtroom while in shackles and in view of the jury.  The state court

8  addressed this claim as follows:

9         Petitioner's trial occurred in Dept. 14 in the basement of the
courthouse.  Because of the physical layout, it is necessary to bring in-

10  custody defendants down about 75 feet of the public hallway to the
courtroom.  This is the same hallway which the jury uses to exit the

11  building.  This necessarily requires special precautions by the bailiffs.  For
this reason, in-custody trials were generally not heard in that department

12  unless there was no other alternative.
       Inman alleges in his petition that "While being escorted to and

13  from the courtroom for trial, Petitioner was subject to being viewed by the
jurors while clad in shackles."  He alleges that Spokes was incompetent by

14  failing to notify the court of this and by failing to request the court to
conduct an examination of any jurors who may have seen him.

15         Petitioner presented the testimony of Angela Cox, who testified
that all the jurors saw Inman in shackles everyday of the trial, that no

16  attempt was made to avoid the jury seeing him transported to the
courtroom.  She informed Spokes of this, but he did nothing.  Billy Inman

17  also testified that he saw Inman in shackles in the hallway when the jury
was coming or going on three or four occasions.  He did not ever hear

18  Spokes report it to the judge.
       The People presented the testimony of the bailiff assigned to 14,

19  Deputy Vivian Holliday Sweatman.  She attended Inman throughout the
trial.  She stated that she had handled other in-custody jury trials in 14, and

20  was well aware of the procedures used to avoid displaying the defendant to
the jury in shackles.  She would generally wait 10 minutes for the jurors to

21  clear the hallway before transporting Inman to the lock-up area.  Before
moving him, she would usually do a visual clearance of the hallway first.

22  On one day, after they began moving down the hallway, she saw a juror
who was returning to the courtroom, having apparently forgotten

23  something.  She stated that she quickly pulled Inman around a corner and
did not think that the juror saw Inman.  She did report the incident to Mr.

24  Spokes and the judge.  The judge decided not to inquire of the jurors
further as the incident was de minimus at worst, and he did not want to

25  draw attention to it.

26  / / /

1

2      Mr. Spokes testified to essentially the same facts as the bailiff,
except that his recollection was that Deputy Holliday told him that the
juror had actually seen Mr. Inman. He couldn't remember if she told him
3      before or at the same time that she told Judge Cole. When Judge Cole
states that he didn't see any point in pursing it further, Mr. Spokes did not
argue or request any voir dire of the jurors. Mr. Spokes testified that he
4      recalled Judge Cole saying something to the effect that "you are entitled to
a fair trial, not a perfect one."

5      The Court did not find the testimony of Angela Cox or Billy Inman
credible on this point. Even assuming that Mr. Spokes' recollection that
6      Deputy Holliday reported that a juror had actually seen Inman in shackles
is correct, Spokes' decision not to escalate the occurrence to a major
7      incident was a reasonable one. Case law is clear that an inadvertent or
accidental view of the defendant in shackles does not render the
8      proceeding unfair (citation omitted), and further dwelling on the incident
by questioning the jurors may have built the incident out of proportion and
9      done more damage than good.

10   The state court reasonably determined that the weight of the credible evidence indicated that, at

11   worst, any incident where a juror saw petitioner in shackles was inadvertent and de minimus.

12   Counsel was not incompetent in deciding not to pursue the issue any further. Furthermore,

13   petitioner was not prejudiced. Petitioner states that counsel was incompetent for failing to bring

14   the issue to the judge's attention or request voir dire of the jurors. The record reflects that,

15   despite counsel not raising the issue, the trial judge was in fact notified of the issue by the court

16   bailiff. The record also reflects that the judge was not inclined to permit any voir dire of the jury,

17   even had counsel requested voir dire.

18                    13.    Testimony From "Jailhouse Snitch"

19          This claim was addressed by the Sacramento County Superior Court as follows:

20          Damian Vuarnet testified at trial that he was housed in the same
jail unit with Inman before trial. Over time, they became acquaintances
21   and Inman began discussing his case with Vuarnet. He eventually told
Vuarnet that he would orally copulate and masturbate his 2 foster sons.
22   He also told Vuarnet that he had favorite boys on the soccer team,
including "Andrew." Inman told him that when the boys were over at his
23   house, he would intentionally leave out X-rated movies, hoping the boys
would watch them. He also told Vuarnet that he would put valium in the
24   kids' sodas so they would pass out and had given "Andrew" valium on the
way home from a Raiders football game, prior to fondling him. He also
25   said that he would give the boys backrubs to get them aroused. He told
Vuarnet that he liked the younger boys more than the older ones, because
26   they were easier to control. He told Vuarnet that his sister Peggy, who

lived with him, never interfered because she was disabled and stayed in her room most of the time.

Inman states in his petition that he gave Mr. Spokes the names of four witnesses who would impeach Vuarnet's testimony (in his written statement, he states there were only 2 names in the report), and that Spokes failed to contact or investigate their testimony. At the hearing, Inman called Dana Troop and John Velasquez to testify, who were 2 of the names he claimed to have given to Spokes. Troop testified that he knew both Inman and Vuarnet while he (Troop) was in custody, but never shared a cell with either. He stated that Vuarnet viewed himself as a boss of sorts in their unit. Troop did not care for him and tried to avoid contact with him. Neither Inman nor Troop were allowed to sit at Vuarnet's table for meals. Although Inman's case was discussed a lot by the inmates in general, Troop never discussed it personally with Inman. He never saw Inman talking with Vuarnet but was not around them a lot. They were both already there when Troop arrived. Although Inman and Vuarnet did not share a cell at first, after they were moved to the downtown jail, they did. Troop was in custody for (and eventually convicted of) a violation of § 288 also.

Velasquez stated that he never saw Inman "working out" with Vuarnet while they were in custody together, never saw him talking to Vuarnet or playing cards with him, or in Vuarnet's "car." Velasquez never heard Inman talking to Vuarnet about his (Inman's) case.

Spokes testified that he could not remember how many witnesses Inman suggested or whether or not Troop or Velasquez were among the names, but he did remember clearly that Bernardo Damian Montano was one of the names, because Mr. Spokes was currently (at that time) representing him on a three strikes case. Mr. Spokes had very good rapport with Montano and had always found him to be very forthcoming in his discussions about his (Montano's) case, which would be a relatively minor case, but for the fairly old strikes that the DA had alleged. However, far from having exculpatory testimony, he corroborated nearly everything that Vuarnet was reportedly saying. When Spokes asked Montano about the report that Inman had been discussing his case with Vuarnet, Montano told him that he had, in fact, heard Inman doing so on a number of occasions, and he (Montano) had repeatedly warned Inman to "keep his mouth shut." Notwithstanding Montano's friendly warnings, Inman continued to do so.

Spokes testified that he did not contact the others for fear that they would have similarly incriminating evidence and he would just be tipping off the DA to it, should the DA check jail visit logs.

The Court believes that the testimony of Troop and Velasquez would have had little impeaching value, had it been presented, and would not have likely resulted in a different result at trial. The Court finds no fault with Spokes' decision not to contact the other names Inman gave him, if any, after the information he received from Montano.

/ / /

/ / /

1   The court agrees with the state court that there was no prejudice resulting from counsel's

2   decision not to pursue the matter at trial.  Despite what petitioner says Troop and Velasquez

3   would have said at trial, counsel discovered that another inmate – Montano – would have

4   corroborated Vuarnet's story.  Based on what counsel learned from Montano, he made the

5   reasonable tactical decision to focus on other issues and not expose any weakness in the case to

6   the prosecution.

7           14.     Videotape Evidence

8           This claim was addressed by the state court as follows:

9                   The interviews of the victims were videotaped in this case,
        consisting of a total of 8 videotapes.  All 8 were discovered to the defense
10      in the normal course of affairs.  Inman alleges that Spokes "failed to attack
        this area and impeach each witnesses [sic] testimony.  Trial counsel's
11      failure to impeach the testimony of complaining witnesses denied
        Petitioner due process."
12              At the hearing, Mr. Spokes testified that he did receive and review
        all 8 tapes.  Either he or his investigator Stan Ross reviewed each one with
13      Mr. Inman (who was in custody at the time).  Each tape was transcribed
        and Spokes had the transcript for each at the trial and used the transcripts
14      to bring out as many inconsistencies as he could with the boys' testimony.
        He recalled in particular using it for the cross examination of "Austin" at
15      pp. RT 402-6.
                At one point, Petitioner did not present any evidence identifying any significant
16      inconsistencies in any of the boys' testimony that was not exploited.
        Rather, his chief complaint here was that his counsel did not play all 8
17      tapes in their entirety for the jury.  Mr. Spokes elected to play 2 tapes in
        their entirety to the jury, primarily for the purpose of showing the allegedly
18      suggestive manner of interviewing the boys.  However, all 8 tapes and
        their transcripts were admitted into evidence and sent into the jury room,
19      and Mr Spokes invited the jury to listen to them on their own.  (RT 478-9).
        At the hearing, Mr. Spokes explained that the two tapes he selected to play
20      were the most egregious examples, and the time required to play the rest
        (nearly 2 days) would not be justified.  He also stated that he did not feel it
21      would be helpful to have all the boys' allegations in those tapes repeated
        again for the jury.
22              At one point, it appears that Judge Cole would not allow the
        remaining 6 into evidence unless they were played in court, and Mr.
23      Spokes indicated he would go ahead and play the remaining 6 in their
        entirety.  However, when Judge Cole changed his mind, Mr. Spokes went
24      back to his original plan.  The Court believes this decision to be
        reasonable, and finds no incompetence.

25

26  / / /

                                             32

1  This court also finds no incompetence (or prejudice for that matter).  It is clear from the jury's

2  verdict that the jury believed petitioner committed the charged acts of child molestation.  Mr.

3  Spokes was rightfully concerned that playing all 8 tapes – instead of just the 2 which most clearly

4  demonstrated allegedly improper interview techniques – would have only compounded the

5  victims' stories in the eyes of the jury.

6          15.    Coaching

7          This claim was addressed by the Stanislaus County Superior Court as follows:

> Angela Cox testified at the hearing that she witnessed certain of the child witnesses in the case being "coached" by a man in the audience who she believed to be the youth pastor for the boys' church.  She said a woman from the hall directed him to sit behind a pillar in the audience section so that he could be seen by the witnesses but not by the judge.
>
> Billy Inman also testified that he saw a man "hiding" in the audience and coaching child witnesses.  He saw him follow them out into the hallway at the break and hugged them.  He also said he believed that the man told the other witnesses what the boys had said.  He related this information to Mr. Spokes at the time.  On cross, he acknowledged that he recognized the man as the boys' youth pastor, and that he didn't actually hear what they were saying in the hall, but saw them praying and assumed the conversation was about the case.
>
> David Kerr testified and identified himself as the youth pastor for the church which the boys attended.  He attended trial most of the days and was in court for John and Andrew's testimony.  He did not intentionally signal or gesture to either of the boys while they were testifying, and does not believe he used any type of body language that would signal any approval or disapproval to them.  He did not relate the testimony to any others.  He did talk with family members in the hallway and pray with them in a supportive way.  He did not tell the boys what to say other than to be honest, because he did not know the details of the case.
>
> The Court found the testimony of Pastor Kerr to be the more believable.  The Court concludes no coaching or violation of the Court orders occurred in this regard.

21  Logically, if no coaching occurred, then counsel was not ineffective for failing to raise the issue

22  of coaching at time of trial.  This court must accept the state court's findings of fact in this

23  regard.  See 28 U.S.C. § 2254(e)(1).  Because the state court reasonably determined that no

24  coaching had occurred, petitioner cannot prevail on his claim of ineffective assistance of counsel.

25  / / /

26  / / /

16.   Right to Testify

The state court set out the following background to this claim:

Inman did not testify at trial.  He now alleges in his petition that "Trial Counsel would not allow Petitioner to exercise his right to testify during trial and went to extremes to convince him from doing so [sic]."

Angela Cox testified at the hearing on behalf of Inman that she convinced Inman not to testify because Mr. Spokes told her to.  She said there was a conversation in the hallway with the entire family and Mr. Spokes about whether Inman should testify.  Mr. Spokes told them he was against Inman testifying.  He did not inform them that it was the defendant's choice to make.

Inman testified that he never told Spokes he did not want him to testify.  He did want to, and Spokes did not give him a chance.  He thought he was going to and was surprised when Spoked told the judge that they were resting and he would not testify.  He [Inman] did not object at the time.

Mr. Spokes recounted that he and his investigator Stan Ross went to the jail to discuss the matter with Inman on Saturday, July 28, the weekend before the defense rested.  They spent an hour and a half with him.  The only topic discussed was whether or not he would testify.  Spokes exhaustively explained the advantages and disadvantages, and told Inman that it would be his call, and he did not have to decide right now, that he could wait until the end of the case, but he must tell him (Spokes) prior to the time they rested.  At the trial, prior to Inman's sister testifying, Spokes advised Inman that she would be the last witness unless he decided to take the stand.  Inman never communicated any desire to testify to him in any way.  Spokes denied asking any family members, including Angela Cox to talk Inman out of testifying or having a conversation with the family about doing so in the hallway.

Stan Ross testified and his account was similar to Mr. Spokes in most respects.  (citation to record omitted).

The court then held as follows:

To the extent that they are in conflict, the Court believes the account presented by Mr. Spokes and Mr. Ross is more accurate than the testimony of Cox and Inman.  The Court does not believe that the standard of minimum competence requires Mr. Spokes to voir dire his client on the record as to his decision on whether or not to testify.  As long as the decision by the client is a knowing and voluntary decision, and the Court believes it was here based on the time Spokes spent with Inman answering questions and discussing the topic, the attorney does not need to explain the decision to the trial judge or the jury.  If the client does not speak up or attempt to say anything to his attorney when the attorney announces that the defense rests (regardless of whether he specifically says his client will not testify), then he has evinced a clear decision not to testify.  Even assuming Mr. Inman was confused and surprised by the fact that the defense was resting, if he does not say anything to his attorney at that point

to correct the error, he has waived his right to testify.  Any Court would certainly have allowed Mr. Spokes to put his client on even though Spokes had announced he was resting if this was brought to the Court's attention before the prosecution called its rebuttal witnesses, and many courts would have allowed him to any time before closing arguments, based on a good faith mistaken understanding by Inman.  Apparently, Inman made no attempts whatsoever to let Spokes know at the time that he wanted to testify, before or after Spokes announced that the defense was resting, so a complaint at this late stage would not merit relief.

Again, this court must accept the factual findings of the state court, unless they are unreasonable. Here, the state court reasonably determined that petitioner had been advised by Mr. Spokes of his right to remain silent or testify, as petitioner chose, and that petitioner waived the right to testify by not speaking up when Mr. Spokes announced that the defense was preparing to rest its case. In any event, even if counsel was somehow incompetent in this regard, petitioner was not prejudiced.  It is clear that the jury believed the victims' stories and disbelieved petitioner's version of events.  Petitioner has not demonstrated how his testimony would have changed this result.

### 17.   In Limine Motions

In denying this claim, the state court held:

> It is not contested that *in limine* motions were heard first in chambers off the record without the defendant present, and then later summarized in open court on the record in the defendant's presence. Inman did not personally waive his presence at any time.
> Mr. Spokes stated that he did not object because this was, at the time, a standard practice of long standing in many courts in the county. When the proceedings are summarized for the record, Counsel are routinely allowed by the Court to state any arguments for the record that they feel must be preserved for appellate purposes.
> The defendant in a criminal trial has the right to be personally present at all trial proceedings.  (citation omitted).  Notwithstanding that Mr. Spokes is correct that the procedure used was a common practice in the county, the better practice is to avoid in-chambers and side-bar conferences whenever possible.  Under the current law, however, such conferences are not necessarily considered a violation of the right to be present or presumed to be prejudicial where the defendant's presence does not bear a "reasonably substantial relationship" to the ability to defend against the charges.  (citation omitted).
> In this case, there were no written motions in limine filed, and it appears that the motions were fairly standard and routine in nature.  The Court finds that the "pre-hearing" in chambers before hearing the motions

35

1          in open court on the record did not violate Petitioner's right to be present
           at trial proceedings and his absence at the in-chambers hearing did not
2          affect his ability to present or participate in his defense.

3    The state court's analysis is sound.  While petitioner was not present for the in-chambers

4    discussions concerning in limine motions, the record demonstrates that he was present in open

5    court with counsel when the motions were decided.  Given his presence in open court, petitioner

6    certainly had the opportunity to participate in his defense (for example, by suggesting a reason

7    for counsel to object to a particular tentative ruling).  Because petitioner's ability to participate in

8    his defense was not compromised, petitioner did not suffer any prejudice from being excluded

9    from in-chambers discussions.

10              18.    _Brady v. Maryland_ Issue

11         Petitioner claims:

12         During trial proceedings, the Court stated, "Okay.  The Brady versus
           Maryland issue I'll address at the time of jury instructions."  The Court did
13         not address the issue in jury instructions, and Trial counsel failed to
           resolve the issue on Petitioner's behalf.
14

15   This claim was denied without comment by the California Supreme Court.  Therefore, the

16   question before this court is whether the state court's denial was an objectively unreasonable

17   application of clearly established federal law.  Given the lack of specificity attending this claim,

18   particularly petitioner's failure to indicate what Brady violation had occurred, it is impossible to

19   say that the state court's denial of this claim was in error.

20              19.    Interview Techniques

21         In addressing this claim, the state court held:

22         Inman alleges that Spokes was "obsessed" with the defense that the
           police used improper and suggestive interviewing techniques with the
23         child witnesses in this case, and "failed to make reasonable investigation
           into other matters of defense."  In his closing argument, Inman specifically
24         identifies the alibi defense as one that Spokes "neglected."  In support of
           his allegation, Inman cites in his rebuttal that Spokes referred to the alibi
25         defense as the "primary defense" on one occasion, and on another occasion
           refers to the alleged improper interviewing technique as the "primary
26         defense."  He also refers to the decision previously discussed to only play

                                           36

2 of the 8 videotapes of victim interviews.

Mr. Spokes testified that at no time did he ever consider that the alleged improper interviewing technique was the only defense in the case. He decided that a broad defense would be best, and presented the attack on the interviewing technique, character witnesses, alibi witnesses on Counts 9 & 10 (the Stockton Speedway testimony), as well as impeachment evidence on many of the witnesses, both with prior inconsistent statements and percipient witnesses to the events, and an expert witness, Dr. Ronald Meister, a licensed psychologist.

The record reflects that Spokes presented 4 alibi witnesses on the Speedway alibi (Frank and Sybil Rust, Anthony Major, Craig M.), 6 character witnesses on Inman's appropriate relationship with the boys on the various soccer teams (Carol K., Zachary S., Kimberly C., Jonathan, Donald Hutchins, Lidia Parman), 5 character witnesses on his appropriate relationship with other boys (Craig M., AnnD., Craig S., Craig S.'s mother, Kerry Goodeyon), 1 character witness on the poor character of "Brian" (Megan), and 4 percipient witnesses relating to the various events (Craig M., Peggy Inman, Matthew D., Dawn Inman).

In his written closing argument, Mr. Inman states that the pretrial investigation reflected in Stan Ross's investigation log only shows that 18 hours were spent investigating his case. In fact, Court exhibit 23 shows that the 18 hours referred to were from 2/28/02 through 4/5/02 only. The logs show that from 7/26/01 through 7/16/02, the date the trial started, Mr. Ross had spent 175 hours investigating the case. Further, Mr. Spokes testified that this was a partial log only, since Mr. Ross was initially being paid out of Mr. Inman's retainer. It was only after that was exhausted that Mr. Spokes began applying to the Court for investigation expenses.

The Court feels there is no evidence whatever of any "over reliance" or "obsession" with one defense at the expense of others on Mr. Spokes part, and that he did present a broad based and thorough defense of the charges.

As the state court notes, Mr. Spokes presented a broad defense which included the improper interviewing technique issue as one of many. Petitioner's claim of ineffective assistance of counsel based on Mr. Spokes' pursuit of what was probably the best defense is absurd.

20.    Alibi Jury Instructions

This claim was addressed by the Court of Appeal, which held:

Inman contends he received ineffective assistance of counsel because his attorney failed to request an instruction on alibi, such as CALJIC No. 4.50. (footnote omitted). This instruction informs the jury that if it has a reasonable doubt about whether the defendant was present when the crime or crimes occurred, it must find him or her not guilty. Inman concedes the trial court does not have a sua sponte obligation to give this instruction. (citation omitted). Therefore, he can raise the issue only through an ineffective assistance of counsel claim.

1  The state court then outlined the state law standards for claims of ineffective assistance of

2  counsel and continued its analysis as follows:

> 3   CALJIC No. 4.50 is a pinpoint instruction that relates to a
>     defendant's claim that he was not present at the time a crime was
> 4   committed. (citations omitted).  Naturally, if a defendant is not present
>     when a crime is committed, in the absence of aider and abettor liability, a
> 5   reasonable doubt must exist as to whether the defendant is guilty, and the
>     jury must return a not guilty verdict.
> 6   CALJIC No. 2.90, however, adequately addresses this issue.  If
>     Inman established that he was not present when the alleged molestations
> 7   occurred, then, pursuant to CALJIC No. 2.90, the jury would have to
>     decide the prosecution failed to meet its burden of establishing the
> 8   defendant was guilty beyond a reasonable doubt.  A successful alibi
>     defense would achieve the same result under either CALJIC No. 2.90 or
> 9   No. 4.50.  (citation omitted).
>     Assuming, however, Inman's trial counsel erred in failing to
> 10  request [an alibi instruction], it is not reasonably probable that Inman
>     would have obtained a more favorable result had the instruction been
> 11  given.  As stated in the preceding section, Inman's assertion that he could
>     not have committed the molestations alleged in counts 9-13 were squarely
> 12  before the jury.  Both attorneys addressed the issue in closing argument.
>     The jury must have addressed the issue and rejected the defense testimony
> 13  in reaching its verdict.  Inman's trial counsel was not ineffective.

14  The failure of counsel to request a specific jury instruction can only give rise to federal habeas

15  relief is such failure resulted in prejudice.  Here, petitioner's alibi defenses were presented to the

16  jury and argued by both sides.  Therefore, he was not prejudiced by the lack of a specific "alibi

17  instruction."  Moreover, petitioner does not state what kind of instruction should have been given

18  or how such instruction would have made a difference in his case.

19     21. <u>Admission by Trial Counsel Regarding Competence</u>

20  The Stanislaus County Superior Court addressed this claim as follows:

> 21  At the hearing, Dawn Inman testified that Spokes told her even
>     before the trial started that he would be incompetent because the Court had
> 22  not approved money for an expert witness.  He repeated again after the
>     verdict was delivered that he had been incompetent as an attorney.  She
> 23  did not remember if he specifically said at that time why he felt he would
>     be incompetent.
> 24  Angela Cox testified at the hearing that Spokes told her that he was
>     incompetent as an attorney after the closing arguments, again after the case
> 25  went to the jury, again after the verdict was read, and again after
>     sentencing.  He states that there were grounds for an appeal based on his
> 26  incompetence because the court did not approve funds for an expert, and

Inman would be out in no time.  He did not give any other reasons why he would be considered incompetent.  She felt he did not do a good job at trial because he was not aggressive enough in his questioning.

Mr. Inman asserts that Spokes informed the trial Court "on numerous occasions" that he was "providing ineffective assistance of counsel due to incompetence" because the "nickels" he was receiving from the Court for his fee made it difficult to provide a proper defense.  Mr. Inman did not provide any citations to the reporter's transcript for these statements.

Mr. Spokes denied ever telling Mr. Inman or any family members or anyone that he was incompetent in representing Inman.  The only time he could remember the term "incompetent" being used was in court on September 26, 2002.  Prior to trial, Inman had plead guilty to Count 21, charging possession of child pornography, in an effort to keep out numerous child pornography images found in his house.  After trial, he requested permission to withdraw that plea, and Mr. Spokes informed the Court that a new attorney would need to be appointed to advise Mr. Inman on that issue, since one of the grounds Mr. Inman was raising was incompetence of counsel.  Mr. Spokes testified that he did not ever suggest to the Court or anyone that he had actually been incompetent.

Mr. Spokes denied making any statements complaining about the Court not authorizing money for an expert, and denied ever telling Mr. Inman or anyone that there was a basis for appeal because of the denial of funds for an expert.  In fact, after an earlier denial of fees, the Court did later authorize money for an expert, Dr. Meister.

Mr. Spokes denied making any statements complaining about his fee or stating that he wasn't being paid enough to provide an adequate defense.  The only time he could recall the term "nickels" being used was a discussion on the record at p. 984, l. 12-14 where he was discussing the timing of the testimony of his expert, Dr. Meister, with the Court, and his hope to conclude the testimony in one day, since that was what the Court had approved.

The Court does not believe that the testimony of Angela Cox or Dawn Inman is credible in this matter.  The Court believes the testimony of Mr. Spokes to be the more logical and believable.  Accordingly, the Court finds no evidence supporting Mr. Inman's assertions on this allegation.

This court must accept the state court's reasonable factual determinations and, therefore, must agree with the state court's conclusion that Mr. Spokes never admitted to any incompetence.  In any event, counsel's admission of incompetence would not necessarily entitle petitioner to habeas relief.  As discussed above, success on a claim of ineffective assistance of counsel required a showing of prejudice.  Thus, even if counsel was in fact incompetent, such incompetence does not equate to habeas relief absent prejudice resulting from a specified incompetent act, which petitioner has not shown.

1           22.    Consecutive Sentences

2           Petitioner contends that trial counsel was ineffective for failing to object to the

3    imposition of consecutive sentences.  This claim was denied by the California Supreme Court

4    without comment or citation.  Therefore, the question before this court is whether the state

5    court's denial was an objectively unreasonable application of clearly established federal law.

6    Under this standard, the court finds no basis for federal habeas relief.

7           The essence of petitioner's argument is that counsel should have objected because

8    consecutive sentences were based on factors found by the judge and not the jury.  Petitioner's

9    argument is based on the rule announced in Apprendi v. New Jersey, 530 U.S. 466 (2000).  In

10   Oregon v. Ice, however, the Supreme Court held that the rule of Apprendi and its progeny does

11   not prohibit states from assigning to judges, rather than juries, the task of finding facts necessary

12   to impose consecutive sentences for multiple offenses.  See 129 S.Ct. 711, 718 (2009).  Thus, as

13   respondent notes, at the time petitioner's case was decided by the state courts, the decision to

14   impose consecutive sentences was a matter of state procedural law not open to federal habeas

15   review.   Because no objection based on a federal constitutional violation would have had merit,

16   counsel was not ineffective for failing to raise such an objection.

17          The court also agrees with respondent that, even if counsel should have made an

18   objection, petitioner was not prejudiced by counsel's failure to do so.  The record reflects that the

19   trial judge made the following ruling regarding consecutive sentences:

20                  THE COURT: All right.  Also, let me say, for purposes of the
             record, that this court is going to make some sentences run consecutive to
21           other sentences, and some of the reasons for that are outlined in the . . .
             probation report, and some of the reasons for that have been suggested to
22           me by other persons I've heard from this morning.
                    And it's clear to the court that the victims in this case were
23           particularly and exceptionally vulnerable; that the manner in which these
             crimes were committed indicates to the court great planning,
24           sophistication, and professionalism.  It's clear to the court that much of the
             lifetime circumstances of the defendant in this case indicate to the court a
25           degree of planning maybe far in advance of the incidents, setting up the
             scenarios that involved these children.

26

                                              40

1

2

> Clearly, the defendant took advantage of positions of trust and confidence to commit these offenses, and these crimes clearly resulted in stolen innocence, not to mention any lifetime scars.
> It's clear to the court that the law provides that there should be no probation in this case, and I'm going to find the defendant is probation ineligible.

3

4

5 Given these statements from the judge, it is extremely unlikely that he would have ruled in

6 petitioner's favor on an objection to imposition of consecutive sentences.

7         **C.**    **Prosecutorial Misconduct (Ground 4)**

8         In Ground 4, petitioner alleges the following instances of prosecutorial

9 misconduct:  (1) charging Counts 1-5 and 8 beyond the statute of limitations; (2) making false

10 statements to the jury; and (3) fabricating evidence.  Success on a claim of prosecutorial

11 misconduct requires a showing that the conduct so infected the trial with unfairness as to make

12 the resulting conviction a denial of due process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).

13 The conduct must be examined to determine "whether, considered in the context of the entire

14 trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the

15 evidence fairly." United States v. Simtob, 901 F.2d 799, 806 (9th Cir. 1990).   Even if an error of

16 constitutional magnitude is determined, such error is considered harmless if the court, after

17 reviewing the entire trial record, concludes that the alleged error did not have a "substantial and

18 injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S.

19 619, 638 (1993).  Error is deemed harmless unless it "is of such a character that its natural effect

20 is to prejudice a litigant's substantial rights." Kotteakos v. United States, 328 U.S. 750, 760-761

21 (1946).  Depending on the case, a prompt and effective admonishment of counsel or curative

22 instruction from the trial judge may effectively "neutralize the damage" from the prosecutor's

23 error. United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d

24 at  806).

25

26

1      "If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose

2   that testimony is false, the conviction must be set aside if there is any reasonable likelihood that

3   the false testimony could have affected the jury verdict." Ortiz v. Stewart, 149 F.3d 923, 936

4   (9th Cir. 1998); see also United States v. Bagley, 473 U.S. 667, 678-79 (1985).  The petitioner

5   bears the heavy burden of establishing that perjured testimony was used.  See United States v.

6   Henson, 123 F.3d 1226, 1240 (9th Cir. 1997), overruled on other ground by United States v.

7   Foster, 165 F.3d 689 (9th Cir. 1999).  Even if the witness lied, misconduct occurs only if the

8   prosecutor knew the testimony was false.  See United States v. Necoechea, 986 F.2d 1273, 1281

9   (9th Cir. 1993).

10                  1.      Charging Beyond the Statute of Limitations

11          As to counts 1-5, petitioner argues:

12                  In Counts 1-5, the complainant alleged on February 27, 2001, that
            Petitioner assaulted him during soccer season in 1994.  Testimony was
13          given that the soccer season in 1994 transpired between September and
            November 1994.  Both [prosecutor] Baker and the complainant told the
14          Court that the assaults took place when the complaint was 11 years old
            and, since his birthday is November 6, 1983, and the statute of limitations
15          is 6 years, Petitioner should not have been charged for the crimes, thereby
            D.D.A. Baker violated his due process rights of a fair trial.
16

17   As to count 8, petitioner argues:

18                  In Ct. 8, Baker charged Petitioner with a crime that was beyond the
            statute of limitations and only because Petitioner brought it to trial
19          counsel's attention after the complainant testified was the count dismissed.

20   These claims were denied by the California Supreme Court without comment or citation.  Thus,

21   the question is whether the silent denial was an objectively unreasonable application of clearly

22   established federal law.

23          As to counts 1-5, it appears that petitioner is operating under the assumption that

24   the six-year statute of limitations began to run sometime in 1994.  He concludes that the charges

25   in counts 1-5 are untimely because they were filed in 2001.  The statue of limitations begins to

26   run on the latest date of allegedly continuing violations.  Because the charges allege conduct

1  from 1994 through 1996, the charges were timely filed.  Even if the charges were filed outside

2  the limitations period, petitioner has not shown that his entire trial was so infected with

3  unfairness as a result.  In particular, petitioner has not shown how the mere filing of untimely

4  charges prejudiced his ability to argue at later stages of the proceedings that such charges should

5  be dismissed as untimely.

6          Turning to petitioner's argument regarding count 8, he admits that the count was

7  dismissed by the prosecutor as untimely.  Because this charge was never presented to the jury, the

8  court cannot say that petitioner suffered an unfair conviction on this charge.  Nor could the filing

9  and subsequent dismissal of the untimely charge have had any effect on the jury's determination

10  as to other counts.  Thus, the state court's denial of this claim was not an objectively

11  unreasonable application of clearly established federal law.

12          2.      Making False Statements to the Jury

13      Petitioner argues:

14          In Counts 6-7, Baker made numerous false statements to the jury
        about Petitioner, his adopted son, and Dr. Debra Johnson, a child
15      psychologist and expert witness in child molest symptomology (for the
        Stanislaus County District Attorney).  Baker possessed documentation that
16      refuted what he told the jury about Petitioner's son, and even told the jury
        about a conversation between Dr. Johnson and Petitioner that never
17      happened, but since Petitioner's son testified he didn't know Dr. Johnson,
        never met Dr. Johnson and, yet Baker told the jury that Petitioner took him
18      to Dr. Johnson.  It should be noted that Dr. Johnson did not testify, but she
        did write a letter to the Stanislaus County Juvenile Commissioner, a letter
19      that was not presented at trial, about how, when angry, the son would
        substitute Petitioner as his offender instead of the actual offender, his
20      paternal father who was in State Prison.  When Baker told the jury the
        multiple lies in this area, he denied Petitioner his due process rights to a
21      fair trial.

22  He also argues:

23          In Ct. 16, Baker told the jury falsities that weren't supported by a
        police report or a video-taped statement that he had in his possession.  He
24      also put a young man on the stand and repeatedly tried to coerce him into
        testifying that Petitioner did something he didn't.

25

26  Finally, petitioner asserts:

1

           While referring to the jail-house snitch, Baker told the jury that
when he testified that Petitioner drugged the complainants and dressed

2

them up like girls, the testimony corroborated that of the complainants.
None of the complainants testified that Petitioner gave them drugs or had

3

them dress up like girls.  Baker's lies denied Petitioner due process of a
fair trial.

4

5

      The Stanislaus County Superior Court addressed petitioner's claim relating to his

6

adopted son as follows:

7

           . . . Inman's argument is apparently that the reason DDA Baker's
statement (that Inman was "attempting" to adopt Kenny for purposes of

8

molesting him) was false because, in fact, Inman had already adopted him
by the time of the alleged molestations.  DDA Baker testified in essence

9

that he may very well have had access to or possessed documents showing
that the adoption was complete at the time, but he just wasn't sure whether

10

it had been completed or not.
           The Court views this as a distinction without a difference.  Far

11

from showing any bad faith on DDA Baker's part, it simply shows a
diligent DA who is trying not to overstate the facts.  The thrust of the

12

argument that Inman had deliberately adopted a fragile and vulnerable
foster child for the purpose of victimizing him further, remained the same,

13

and was clearly supported by the evidence presented at trial.  There was
clearly no prejudice to Inman based on the inadvertent misstatement.

14

15 Although the state court considered evidence during the evidentiary hearing regarding

16 petitioner's claim that the prosecutor made false statements concerning Dr. Johnson, that issue is

17 not addressed in any reasoned decision.  Nor did the state court discuss any aspect of the claim

18 other than the prosecutor's statement regarding petitioner's adoption of "Kenny."  The state court

19 generally concluded, however, that there was no misconduct shown on any of petitioner's claims.

20 Therefore, the portion of the claim which was discussed by the state court in a reasoned decision

21 will be reviewed to determine if the decision is either contrary to or an unreasonable application

22 of clearly established federal law.  As to the portions of the claim silently denied by the state

23 court, this court will review to determine if the denial is an objectively unreasonable application

24 of clearly established federal law.

25       With these standards of review in mind, the court finds that federal habeas relief is

26 not warranted.  As to the prosecutor's statement to the jury that Inman was attempting to adopt

1   "Kenny" for purposes of molesting him, it appears that any inaccuracy in the prosecutor's

2   statement was the result of a good-faith error.  According to plaintiff, the adoption had already

3   been finalized by the time the prosecutor made the statement.  Thus, plaintiff appears to

4   conclude, it would have been accurate if the prosecutor argued to the jury that Inman had

5   completed the adoption of "Kenny" in order to molest him.  As the state court observed, the two

6   statements present a distinction without a difference.  Either way, the prosecutor's point would

7   have been the same.  The error as to whether the adoption was pending or had been completed is

8   so trivial that it could not have adversely impacted the jury's duty to judge the evidence fairly.

9            As to the prosecutor's statements concerning Dr. Johnson, petitioner stated at the

10  state court evidentiary hearing that he was challenging the following from the prosecutor's

11  closing argument:

12           Mr. Inman takes Kenny to her [Dr. Johnson] and says: "Kenny has
         been telling me that he was molested by his real dad."  And so Dr. Johnson
13       begins investigating this and she ends up actually making a report for the
         court for court purposes, and all along she is, of course, a friend of Mr.
14       Inman's.

15  When asked by petitioner at the hearing what evidence supported this statement, the prosecutor

16  stated:

17           Well, I was summarizing what I was aware of from all of those
         sources I just mentioned.  That being – and again, also taking into account
18       probably Dr. Kempf's report as well, in which Dr. Johnson, and in her
         own letter, states that . . . Kenny was brought to Parents United by
19       yourself, and that Kenny was making statements that – or at least
         inconsistent statements to the doctors regarding . . . his natural father
20       molesting him, and then at times revealed that it was actually you that was
         molesting him.
21           So that although it's written in quotes, that was simply my
         summary of the way in which you took Kenny to Parents United.
22

23  ///

24  ///

25  ///

26  ///

1  When asked by petitioner whether any documentation states that petitioner was the one who took

2  "Kenny" to Parents United, the prosecutor responded:

3            In Dr. Johnson's letter she indicated that in May of 1997 Kenny
          was referred to this program by his adoptive father, Ron Inman, as a result

4          of statements by Kenny that he was being molested – or had been molested
          by his natural father.  So that was an indication to me that you're the one

5          that brought Kenny to Parents United . . . for the purpose of investigating
          those allegations.

6

7  The prosecutor also noted that Detective Borges stated during defense cross examination that

8  Kenny had been taken to Parents United by petitioner.  The court agrees with respondent that, on

9  this record, petitioner cannot establish that he made any false statement concerning whether

10  petitioner took "Kenny" to Parents United for counseling with Dr. Johnson.  The state court's

11  silent denial of this aspect of petitioner's claim was not an objectively unreasonable application

12  of clearly established federal law.

13            Regarding the portion of petitioner's claim attacking the prosecutor's statements

14  about Vuarnet (the "snitch"), the prosecutor stated as follows during his opening statement:

15            You'll hear such details as Mr. Inman telling Mr. Vuarnet, "Hey,
          you know, I used to leave porn flicks and dirty material out for the boys,

16          hoping that they will find it.  I'd go out in the garage and give them the
          opportunity to come across these X-rated flicks."

17            Inman told Vuarnet that he would give the kids Valiums . . . in
          their sodas to get them to, you know, a relaxed state.  He would give them

18          back rubs after being in the pool or spa.  While they were in their soccer
          shorts, . . . he would give them back rubs and Mr. Inman would get

19          aroused during these back rubs.

20  A review of the trial transcripts reflects that Vuarnet's testimony was consistent with the

21  prosecutor's description during opening statements.  During closing arguments, the prosecutor

22  made the following arguments concerning Vuarnet's testimony:

23            The reason why you should put weight into his testimony is
          because he records conversations – not records with a tape recorder, but he

24          writes down conversations that he had during the course of the time he
          was with Mr. Inman in which Mr. Inman describes and names these boys.

25            You heard evidence that nowhere in the charging documents, nor
          in the police reports, were these names ever given.

26

> The boys' names were used by Mr. Inman.  He described which ones were his favorites.  He described acts that he did with them, the back rubs.  He even gave some insight to Mr. Vuarnet on some things that maybe the kids weren't even privy to, like maybe being drugged on some of the incidents, being given Valium in their drinks to make them a little bit groggy.
>
> Mr. Vuarnet also talked about, well, Ron had this thing about dressing some of them up as girls.  Well, you know, we didn't hear any evidence about that, and maybe that's Mr. Inman being a braggard and exaggerating things to Vuarnet.  The conduct and the names described by Mr. Vuarnet corroborate the testimony of the victims.

Petitioner's claim is based on the mistaken notion that the prosecutor told the jury that Vuarnet's statements corroborated the victims' statements, but that no victim ever stated that petitioner gave them drugs or dressed them like girls.  Contrary to petitioner's assertion, however, the prosecutor never said anything of the sort.  Instead, he merely stated in opening statements what Vuarnet's testimony would be, and in closing arguments what the testimony had been.  The prosecutor also specifically acknowledged in his closing arguments that there is no evidence that any of the victims had been dressed like girls.  Because the prosecutor never told the jury that Vuarnet's testimony corroborated specific portions of victim statements, there was no false statement to the jury in this regard and, therefore, no misconduct.  The state court's silent denial of this claim was not an objectively unreasonable application of clearly established federal law.

Finally, the court addressed petitioner's general contention that the prosecutor made false statements to the jury regarding count 16.  Petitioner claims that the prosecutor told the jury things that were not supported by evidence in his possession.  Petitioner does not, however, state which statements the prosecutor made which were false.  Petitioner is not entitled to federal habeas relief on a conclusory claim and the state court's silent denial of this claim was not an objectively unreasonable application of clearly established federal law.

/ / /

/ / /

/ / /

1        3.      Fabricating Evidence

2     Petitioner claims:

3            In Ct. 19, Baker possessed the video-taped interview of
      complainant, and yet he fabricated statements about how events occurred
4     which didn't match what the complainant alleged or testified to.

5   This claim was apparently denied without comment by the state courts.[3]  Therefore, the question

6   before this court is whether the silent denial was an objectively unreasonable application of

7   clearly established federal law.  The court finds that it was not.  As with petitioner's claim

8   discussed above concerning allegedly false statements made by the prosecutor about count 16,

9   petitioner does not state which statements the prosecutor allegedly fabricated.  The state court's

10  silent denial of such a conclusory claim was not objectively unreasonable.

11     **D.      Trial Court Error (Grounds 5 and 6)**

12            In Grounds 5 and 6, petitioner recasts many of his claims of ineffective assistance

13  of counsel by arguing that the trial court erred in the following ways: (1) by allowing him to be

14  viewed by the jury while in shackles; (2) by erroneously instructing the jury; (3) by conducting

15  in-chambers hearings on in limine motions without petitioner present; (4) by ordering petitioner

16  to answer questions posed by a probation officer without his attorney present; (5) by failing to

17  recuse himself; (6) by failing to address a violation of Brady v. Maryland; (7) by not granting

18  defense counsel an early recess; (8) by denying funding for an expert witness; (9) by failing to

19  advise petitioner of his right to testify; and (10) by imposing consecutive sentences.

20  ///

21  ///

22  ///

23

24          [3]    This issue was not specifically addressed by the Stanislaus County Superior Court
    in its discussion of petitioner's claims of prosecutorial misconduct.  The state court did rule,
25  however, that it found no misconduct.  It did not provide any reasoning for this conclusion with
    respect to allegedly false statements regarding Dr. Johnson.  In any event, respondent concedes
26  that this claim is exhausted.

1        The court observes that, with the exception of petitioner's claim of instructional

2  error related to CALJIC No. 4.71.5, petitioner's claims of trial court error were denied by the

3  California Supreme Court without comment or citation.  While some of the relevant issues were

4  tangentially addressed by the state court in the context of addressing petitioner's related claims of

5  ineffective assistance of counsel, the state courts provide no reasoning in the context of trial court

6  errors.  Therefore, with the exception of the claim of instructional error, petitioner's trial court

7  error claims are reviewed to determine whether the state court's silent denial was an objectively

8  unreasonable application of clearly established federal law.  Because there is a reasoned decision

9  as to the claim of instructional error, that claim is reviewed to determine whether the state court's

10  decision was either an unreasonable application of or contrary to clearly established federal law.

11        1.    Shackles

12        The Supreme Court has held that visible shackles may only be justified by an

13  essential state interest, such as court security.  See Deck v. Missouri, 544 U.S. 622 (2005).  In

14  this case, the record establishes that the trial department where petitioner's trial occurred did not

15  have access to a secure lock-up area, thus necessitating the use of shackles to transport prisoners

16  through the public hallways from a separate lock-up area to the courtroom.  Therefore, the use of

17  visible shackles was justified under Deck and the trial court committed no error by not allowing

18  further inquiry into the matter.[4]  The state court's silent denial of this claim was not an

19  objectively unreasonable application of clearly established federal law.

20  / / /

21  / / /

22  / / /

23

24        [4]    Furthermore, the state court found that any view of petitioner in shackles by a
juror was inadvertent or accidental.  This is a reasonable determination of the facts which this

25  court must accept.  The Ninth Circuit has held that a brief accidental view of a defendant in
shackles does not violate the constitution.  See Ghent v. Woodford, 297 F.3d 1121 (9th Cir.

26  2002).

1        2.      In Limine Motions

2            Petitioner contends that the trial court erred by excluding him from in-chambers

3    discussions concerning in limine motions.  As an aspect of the right to participate in the defense,

4    a defendant has a constitutional right to be present at all critical stages of the proceedings.  See

5    Illinois v. Allen, 397 U.S. 337 (1970).  Where a defendant's presence is not needed to insure the

6    fundamental fairness of the proceedings, absence does not violate due process.  See United States

7    v. Gagnon, 470 U.S. 522 (1985) (per curiam).  In this case, it is undisputed that petitioner was

8    not present during informal in-chambers discussions of the in limine motions.  Petitioner was,

9    however, present in court when the tentative rulings were further discussed and rendered into

10   final rulings.  Because petitioner was present when the actual rulings were announced by the

11   judge, his presence during the in-chambers discussions was not necessary to guarantee that

12   petitioner had an opportunity to participate in his defense.  Because no constitutional violation

13   occurred, the state court's silent denial of this claim was not an objectively unreasonable

14   application of clearly established federal law.

15        3.      Probation Interview

16            Petitioner contends that the trial court erred by requiring him to answer questions

17   posed by a probation officer in connection with preparing a pre-sentencing report for the trial

18   judge without his attorney present.  As a matter of law, petitioner cannot show a federal

19   constitutional violation because there is no Sixth Amendment right to counsel at a pre-sentencing

20   interview.  See Baumann v. United States, 692 F.2d 565 (9th Cir. 1982) (citing Estelle v. Smith,

21   541 U.S. 454, 470 n.14 (1981)).  Because no constitutional violation occurred, the state court's

22   silent denial of this claim was not an objectively unreasonable application of clearly established

23   federal law.

24   / / /

25   / / /

26   / / /

1        4.      Recusal

2        According to petitioner, he filed a motion to dismiss his case due to alleged

3  governmental misconduct arising from the seizure of Peacock's computer (discussed above).

4  Petitioner claims that the judge assigned to hear that motion (who was not the judge presiding at

5  trial) should have recused himself because he had previously recused himself from ruling on the

6  warrant for Peacock's computer.  Absent a showing of actual bias – which petitioner has not

7  demonstrated – the Supreme Court has recognized three instances where due process requires

8  recusal: (1) where the judge has a direct, personal, and substantial pecuniary interest in the case,

9  see Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 824 (1986); (2) where the judge is personally

10 embroiled in a dispute with a litigant, see Mayberry v. Pennsylvania, 400 U.S. 455 (1971); and

11 (3) where there is danger that the prosecutorial and adjudicative functions will exist in the same

12 body, see In re Murchison, 349 U.S. 133 (1955).  Because petitioner has not established any of

13 these circumstances, the judge did not commit constitutional error.  In the absence of error, the

14 state court's silent denial was necessarily objectively reasonable.

15       5.      Jury Instructions

16       In general, to warrant federal habeas relief, a challenged jury instruction "cannot

17 be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

18 process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

19 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

20 must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

21 conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

22 414 U.S. at 147).  In making its determination, this court must evaluate an allegedly ambiguous

23 jury instruction "'in the context of the overall charge to the jury as a component of the entire trial

24 process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

25 1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

26 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

51

1   way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

2   U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

3   instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Where an instruction is missing a

4   necessary element completely, the "reasonable likelihood" standard does not apply and the court

5   may not ". . . assume that the jurors inferred the missing element from their general experience or

6   from other instructions. . . ."  See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994).  In the

7   case of an instruction which omits a necessary element, constitutional error has occurred.  See id.

8         It is well-established that the burden is on the prosecution to prove each and every

9   element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364

10  (1970).  Therefore, due process is violated by jury instructions which use mandatory

11  presumptions to relieve the prosecution's burden of proof on any element of the crime charged.

12  See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510

13  (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed

14  fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a

15  permissive presumption allows, but does not require, the trier of fact to infer an elemental fact

16  from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157

17  (1979).  The ultimate test of the constitutionality of any presumption remains constant –  the

18  instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced

19  by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In

20  re Winship, 397 U.S. at 364).

21        Even if there is constitutional error, non-structural errors may be harmless.  See

22  Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386

23  U.S. 18 (1967)).  In the context of jury instructions, an error is not structural so long as the error

24  does not "vitiat[e] all the jury's findings."  Sullivan v. Louisiana, 508 U.S. 275, 2781 (1993)

25  (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to

26  harmless error analysis).  An instructional error which resulted in omission of an element of the

1  offense was a trial error subject to harmless error review.  See Hedgpeth, 129 S.Ct. at 532 (citing

2  Neder v. United States, 527 U.S. 1 (1999)).  An erroneous aider and abettor instruction is also not

3  structural.  See id. (citing California v. Roy, 519 U.S. 2 (1996) (per curiam)).  A jury instruction

4  which misstates an element of an offense is also not structural.  See id. (citing Pope v. Illinois,

5  481 U.S. 497 (1987)).  An erroneous burden-shifting instruction is also not structural.  See id.

6  (citing Rose v. Clark, 478 U.S. 570 (1986)).  Finally, an instruction on multiple theories of guilt

7  where one of the theories is improper does not result in a structural error requiring automatic

8  reversal but is error subject to harmless error analysis.  See id.

9         In Chapman, a case before the Supreme Court on direct review, the Court held

10 that "before a [non-structural] constitutional error can be held harmless, the court must be able to

11 declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  A different

12 harmless error standard applies to cases on collateral review.  In Brecht v. Abrahamson, the

13 Court stated that applying the Chapman standard on collateral review "undermines the States'

14 interest in finality and infringes upon their sovereignty over criminal matters."  507 U.S. 619,

15 637.  The Court also noted that the Chapman standard is at odds with the historic meaning of

16 habeas corpus – which is meant to afford relief only to those who have been grievously wronged

17 – because it would require relief where there is only a reasonable possibility that a constitutional

18 error contributed to the verdict.  See id.  Therefore, in habeas cases, the standard applied in

19 Kotteakos v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-

20 structural constitutional errors.  See Brecht, 507 U.S. at 637.  Under this standard, relief is

21 available where non-structural error occurs only where such error "had a substantial and injurious

22 effect or influence in determining the jury's verdict."  Kotteakos, 328 U.S. at 776.

23        Here, petitioner claims two instances of trial court error relating to jury

24 instructions: (1) the trial court erred by instructing the jury pursuant to CALJIC No. 4.71.5; and

25 (2) the trial court erred by instructing the jury to decide the question of the court's jurisdiction

26 over certain counts.

1    As to CALJIC No. 4.71.5, the California Court of Appeal addressed this claim as

2  follows:

3         The prosecution argued that on September 19, 1998, the night
   before the Raiders/Broncos football game, Inman molested Victim #3, as
4  charged in counts 9 and 10.  Inman presented evidence that on that night
   he was at the stock car races in Stockton and therefor could not have
5  molested Victim #3.
          The prosecution claimed that Inman molested Victim #4, as
6  contended in counts 11 and 12, after they returned from a trip to Monterey.
   Inman did not dispute the trip occurred but presented evidence that he took
7  Victim #4 home immediately after putting Victim #2 and Victim #2's
   brother to bed.  Thus, Inman argued he had no opportunity to commit the
8  acts alleged in counts 11 and 12.
          The prosecution alleged in count 13 that Inman molested Victim #4
9  in the hot tub on the night before the snow ski trip.  Inman presented
   evidence that his sister watched the two the entire time they were in the
10 hot tub, thus establishing that Inman had no opportunity to molest Victim
   #4 in the hot tub.

11

12 The court noted at footnote 6 that "Inman was convicted of two other counts on the same night

13 that occurred in the house" but presented no alibi defense as to these incidents.  Continuing its

14 discussion, the California Court of Appeal stated:

15        The trial court instructed the jury with CALJIC No. 4.71.5, which
   instructs the jury that when the information alleges an act occurred within
16 a specified time period, the jury unanimously must agree that a specific act
   occurred and that this act occurred within the designated timeframe.

17

18 In footnote 7, the court quoted CALJIC No. 4.71.5, as given in this case, as follows:

19        The instruction as read to the jury states: "Defendant is accused in
   the information of having committed the crimes on or about and between
20 specified periods of time.  In order to find the defendant guilty, it is
   necessary for the prosecution to prove beyond a reasonable doubt that the
21 commission of the specific act constituting each crime was within the
   period alleged, and, in order to find the defendant guilty, you must
22 unanimously agree upon the commission of the same specific act
   constituting each crime within the period alleged.  It is not necessary that
23 the particular act committed so agreed upon be stated in the verdict."

24 The state court continued its substantive discussion as follows:

25        . . . Inman contends this instruction was proper as to counts 1-7, 14-15,
   and 17-20, but argues it should not have been given on counts 9-13
26 because the prosecution established a specific date for the commission of

those crimes.  The Use Note for CALJIC No. 4.71.5 states that the instruction should be used where the prosecution has not elected to rely upon any specific date or dates on which the crime occurred.

Inman relies on two cases to support his argument, *People v. Jones* (2001) 9 Cal.3d 546, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 3, and *people v. Barney* (1983) 143 Cal.App.3d 490.  In *Jones*, the defendant was convicted of three counts of selling marijuana.  He presented evidence that he was out of the state on the date of the last sale.  (citation omitted).  The trial court instructed the jury with CALJIC No. 4.71 (not No. 4.71.5), which instructs the jury that when the crime is alleged to have occurred on or about a certain date, it is not necessary that the proof show that it was committed on that precise date.  (footnote omitted).

The Supreme Court held that the trial court erred in giving CALJIC No. 4.71 because there was testimony that the last transaction occurred on a specific date, and the defendant presented an alibi for that date, thus making the date of the alleged transaction a material matter for the jury to decide.  (citation omitted).

The Supreme Court quoted *People v. Waits* (1936) 18 Cal.App.2d 20, 21 for its reasoning: "In light of appellant's alibi defense, the time the alleged offenses were committed became material, and it was the duty of the trial court to limit the jury in its consideration of the evidence to the period which the prosecution selected as the time of the commission of the offenses. [Citation].  It was, therefore, prejudicially erroneous for the trial court to instruct the jury . . . that it was wholly immaterial on what day the offenses were committed."  (citation omitted).

In *Barney*, the defendant was convicted of molesting one of his daughters and his granddaughter.  The granddaughter was vague as to when the final act of molestation occurred.  The testimony established that it must have occurred during a specific weekend.  The defendant presented testimony that the act could not have occurred on this weekend because others were present.  The appellate court held the trial court erred in instructing the jury with a modified version of CALJIC No. 4.71.

After citing *Jones*, the appellate court stated: "Ordinarily, the People need not plead the exact time of commission of an alleged offense. (Pen. Code, § 955).  However, if the defense is alibi or, as here, lack of opportunity to commit the offense, the exact time of commission becomes critically relevant to the maintenance of the defense.  An instruction which deflects the jury's attention from temporal detail may unconstitutionally impede the defense.  The defendant is entitled as a matter of due process to have the time of commission of the offense fixed in order to demonstrate he was elsewhere or otherwise disenabled from its commission."  (citation omitted).

The *Jones/Barney* line of cases can be distinguished.  First, the jury in this case was instructed with CALJIC No. 4.71.5, not No. 4.71 as in *Jones* and *Barney*.  CALJIC No. 4.71 was improper in *Jones* and *Barney* because it told the jury that "it is not necessary that the proof show that [the crime] was committed on that precise date. . . ."  The evidence in both cases established that the crime did occur on a precise date, and in each case the defendant presented evidence that he could not have committed the crime on that precise date.  CALJIC No. 4.71 was erroneous because it

told the jury to ignore a material issue in each case.  Thus, as the *Jones/Barney* line of cases hold, when the date is material, it is error to give CALJIC No. 4.71.

CALJIC No. 4.71.5, in contrast, does not suffer from the same infirmity because it does not tell the jury that it is unnecessary to establish the crime was committed on a specific date.  Instead, CALJIC No. 4.71.5 is a unanimity instruction.  (citation omitted)  It advises the jury that to convict the defendant, it must unanimously agree that the crime occurred and that it was committed during the specified time period.  Unlike CALJIC No. 4.71, this instructions does not relieve the prosecution of the burden of establishing the crime occurred on a specific date when the date is material.  Therefore, the *Jones/Barney* line of cases does not aid Inman.

The Use Note for CALJIC No. 4.71.5, however, does indicate that the instruction should be used when "the prosecution has not elected to rely upon any specific date or dates."  For counts 1-7, 14-15, and 17-20, the instruction was appropriate because the prosecution did not elect to rely on a specific date to establish these crimes occurred.  For counts 9-13, however, the instruction may have been improper because the testimony established a specific date on which the crimes occurred, and Inman presented testimony attempting to establish he could not have committed the crimes on those specific dates.  (footnote omitted).  The trial court may have been well served to limit CALJIC No. 4.71.5 to counts 1-7, 14-15, and 17-20.

If there were error, we would find it harmless. . . . (citations omitted).  [¶] The prosecution in argument reiterated the dates the incidents in counts 9-13 allegedly occurred and directly addressed each of Inman's alleged alibis.  Inman's counsel argued the events could not have occurred for the reasons stated above.  Thus, the issue was squarely before the jury and must have been addressed in reaching a verdict.

In addition, the only true alibi, Inman claiming he did not commit the act because he was some place other than where the incident occurred, was for counts 9 and 10.  Inman acknowledged that he took Victim #4 with him on the trip to Monterey, which preceded the actions in counts 11 and 12, but presented evidence that he was not in the house alone with Victim #4 when Victim #4 stated the incidents occurred.  Similarly, in count 13 everyone testified that Victim #4 and Inman were in the hot tub together, but Inman contended he did not have an opportunity to fondle Victim #4 because his sister was watching the whole time.  So, the issue was not whether Inman was present when the alleged molestations occurred but rather who was being truthful – the victims or Inman's friends and relatives who were attempting to provide a defense to the charges.

Based on this, the state court concluded that any instructional error was harmless.

/ / /

/ / /

/ / /

1        At the outset, the court finds that there was no instructional error.  As the state

2   court observed, CALJIC No. 4.71.5 is a unanimity instruction.  It merely instructs the jury that,

3   where the prosecution alleges that a crime occurred within a specific time period, the jury must

4   unanimously agree that both a crime occurred and that it occurred within the alleged time frame.

5   The instruction specifically states that the prosecution bears the burden of proof beyond a

6   reasonable doubt as to these two elements.  Thus, the instruction did not undermine the jury's

7   sole responsibility of finding the necessary facts beyond a reasonable doubt.

8        The court will, however, assume for the moment that the trial court did in fact err

9   when it instructed the jury pursuant to CALJIC No. 4.71.5 as to counts 9 through 13 because the

10  testimony established that the crimes alleged in those counts occurred on specific dates and

11  because petitioner attempted to present alibi defenses as to those dates.  Assuming error, the

12  court agrees with the state court that any error was harmless.  According to petitioner, the alleged

13  instructional error had the result of confusing the jury with respect to his alibi defense because

14  the instruction referred to a range of dates when the crimes were committed whereas the

15  testimony offered by the prosecution pinpointed specific dates.  The court finds any error

16  harmless because it is clear that the jury was not confused.  Specifically, petitioner's counsel

17  argued the various alibis, which the jury disbelieved.  Based on the testimony and arguments

18  presented, the jury must have understood that the issue with respect to counts 9 through 13 was

19  whether petitioner's various alibis meant that the crimes could not have occurred as the

20  prosecution alleged (i.e., committed by petitioner on specific dates).  As to each count,

21  petitioner's counsel presented alibi evidence which the jury did not believe.

22       Petitioner also argues that the trial court erred by instructing the jury to decide the

23  issue of jurisdiction .  Because this claim was denied by the California Supreme Court without

24  comment or citation, this court will assume the state court applied the correct clearly established

25  federal law and will review to determine if the state court's decision was an objectively

26  unreasonable application of that law.  Under this standard, the court finds no basis for federal

57

1   habeas relief.  In particular, even if there somehow was some error in giving this instruction, any

2   error could not have been prejudicial because the instruction benefitted petitioner.  Without an

3   instruction, the judge would have been in the position to decide the jurisdictional issue.

4   However, by giving the instruction, the trial court left it to the jury to determine whether the

5   prosecution had established the necessary facts to establish the court's jurisdiction.

6          6.     *Brady v. Maryland*  Issue

7          According to petitioner, the trial court acknowledged that there was a <u>Brady</u> issue

8   yet failed to address it.  As respondent notes, however, petitioner has not identified what <u>Brady</u>

9   violation allegedly occurred.  Absent a prima facie showing of a <u>Brady</u> violation, it is impossible

10  for the court to evaluate the trial court's conduct in this regard.  Because petitioner's claim is

11  vague and conclusory, federal habeas relief is not available.

12         7.     <u>Recess Request</u>

13         Petitioner claims that the trial court committed reversible error by permitting the

14  prosecution to recess early but denied the same request by the defense.  Petitioner does not,

15  however, state how this rendered his trial unfair or otherwise violated a constitutional right.  At

16  best, petitioner's claim is based on some transgression of state law governing when a request for

17  an early recess should be granted.   As discussed above, such a claim is not cognizable.

18         8.     <u>Funds for Expert Witness</u>

19         Petitioner claims that the trial court improperly denied him funds for an expert

20  witness.  The record reflects, however, that the court did in fact appoint an expert – Dr. Meister –

21  and that the expert testified at trial.  Petitioner has not identified an expert that he requested that

22  was not funded.  Absent a showing of a constitutional violation, the court cannot say that the

23  state court's silent denial of this claim was an objectively unreasonable application of clearly

24  established federal law.

25  / / /

26  / / /

58

9.      Right to Testify

Petitioner argues that the trial court erred in not advising him of his right to

testify.  As respondent correctly notes, however, the trial court has no such duty.  See United

States v. Joelson, 7 F.3d 174 (9th Cir. 1993).  Petitioner has not pointed to any Supreme Court

case holding otherwise.  Federal habeas relief is not available where no Supreme Court precedent

exists to define the right allegedly violated.

10.      Consecutive Sentences

Petitioner contends in Ground 6 that the trial court erred in imposing consecutive

sentences based on factors decided by the judge not the jury.   As discussed above in the context

of petitioner's ineffective assistance of trial counsel claims, at the time petitioner's case was

decided by the state courts the decision to impose consecutive sentences was a matter of state

procedural law and, therefore, not subject to federal habeas review.  A writ of habeas corpus is

available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on

the state courts.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v.

Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available for alleged error in the

interpretation or application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn,

807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).

**E.      Ineffective Assistance of Appellate Counsel (Ground 7)**

The Strickland standards also apply to appellate counsel.  See Smith v. Robbins,

528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882

F.2d 1428, 1433 (9th Cir. 1989).  However, an indigent defendant "does not have a constitutional

right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel,

as a matter of professional judgment, decides not to present those points."  Jones v. Barnes, 463

U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.

Otherwise, the ability of counsel to present the client's case in accord with counsel's professional

evaluation would be "seriously undermined."  Id.; see also Smith v. Stewart, 140 F.3d 1263,

1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.")  Further, there is, of course, no obligation to raise meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88. Thus, counsel is not deficient for failing to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal.  See id. at n.9.

        In Ground 7 petitioner argues that appellate counsel was ineffective for failing to raise all appealable issues on direct appeal.  Specifically, petitioner claims:

> Petitioner informed appellate counsel of the appealable issues in grounds 3, 4, and 5 [as outlined in the federal petition] and furnished counsel with documentation to support those issues to be raised on direct appeal.  Jurisdictional and prejudicial errors on the part of the trial court were the most damaging to Petitioner so appellate counsel informed Petitioner to assert in a petition for a writ of habeas corpus that she provided ineffective assistance of appellate counsel during that legal process.

This claim was denied without comment or citation by the California Supreme Court.  Therefore, the proper standard of review is whether the state court's silent denial was an objectively unreasonable application of Strickland.

        Petitioner argues essentially that appellate counsel was ineffective for failing to raise petitioner's claims regarding ineffective assistance of trial counsel, prosecutorial misconduct, and trial court errors on direct appeal.  As to claims of ineffective assistance of trial counsel, petitioner was not prejudiced because such claims are cognizable in a collateral challenge.  In other words, the failure to raise those claims on direct appeal did not result in any procedural default.  In fact, the claims were addressed in detail by the Stanislaus County Superior Court in a collateral proceeding.  As to claims of prosecutorial misconduct and trial court errors, none of those claims have merit, as discussed in detail above.  An appellate attorney is not ineffective for omitting meritless claims on appeal.  To the contrary, she does her client a service by focusing the appellate court on only those issues with the greatest chance of success.  For

1   these reasons, the court finds that the state court's silent denial of petitioner's claim of ineffective

2   assistance of appellate counsel was not an objectively unreasonable application of the Strickland

3   standard.

4         **F.**   **Petitioner's State Habeas Corpus Case (Grounds 2 and 8)**

5         In Ground 2, petitioner claims that the Stanislaus County Superior Court failed to

6   conduct the evidentiary hearing in accordance with California court rules and the California

7   Court of Appeal's remand order.  In Ground 8, petitioner contends that the state court's denial of

8   habeas relief was improper because "Petitioner presented sufficient evidence during evidentiary

9   hearing to support his challenge."   The court agrees with respondent that Ground 2 does not state

10  a claim for federal habeas relief because such relief is not available based solely on errors of state

11  law.

12        As to Ground 8, which was denied by the California Supreme Court without

13  comment or citation, the court finds that the claim is also not cognizable in that it seeks review

14  based solely on alleged errors of state law.  To the extent petitioner is arguing in Ground 8 that

15  the denial of habeas relief by the state court resulted from an unreasonable determination of the

16  facts, this court finds no basis for relief under this standard.  The state courts discussed the facts

17  of petitioner's case in detail in the two reasoned decision before this court, and nowhere did the

18  state courts make unreasonable determinations of facts.  In particular, with respect to the

19  evidentiary hearing held in connection with petitioner's state habeas petition, the trial judge

20  reasonably weighed the credibility of the various witnesses and made determinations as to who to

21  believe.  None of the ultimate factual determinations reached after the evidentiary hearing were

22  themselves unreasonable.  Petitioner's disagreement with a state court judge's reasonable factual

23  determinations does not entitle him to federal habeas relief.

24  / / /

25  / / /

26  / / /

**IV.  CONCLUSION**

For the reasons discussed above, the court finds that federal habeas relief is not warranted in this case.  Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the court has considered whether to issue a certificate of appealability.  Before petitioner can appeal this decision, a certificate of appealability must issue.  See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  Where, as here, the petition is denied on the merits, a certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue.  See Fed. R. App. P. 22(b).  Where the petition is dismissed on procedural grounds, a certificate of appealability "should issue if the prisoner can show:  (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'"  Morris v. Woodford, 229 F.3d 775, 780 (9th Cir. 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000)).  For the reasons set forth above, the court finds that issuance of a certificate of appealability is not warranted in this case.

Accordingly, IT IS HEREBY ORDERED that petitioner's petition for a writ of habeas corpus (Doc. 1) is denied without issuance of a certificate of appealability.


DATED:  July 2, 2010

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE